**ORDERED** that the Department of Commerce shall report the results of its remand determination to the Court within 45 days.

**MITSUBISHI INTERNATIONAL CORP., Plaintiff,**

v.

**UNITED STATES, Defendant.**

**Court Number 88–10–00810.**

United States Court of International Trade.

Aug. 12, 1993.

Barnes, Richardson & Colburn, Sandra Liss Friedman and Frederic D. Van Arnam, Jr., New York City, for plaintiff.

Frank W. Hunger, Asst. Atty. Gen. of the U.S., Joseph I. Liebman, Atty-in-Charge, Intern. Trade Field Office, Commercial Litigation Branch, Civ. Div., U.S. Dept. of Justice, and Mark S. Sochaczewsky; Edward N. Maurer, Atty., U.S. Customs Service, Washington, DC, of Counsel, for defendant.

*OPINION*

CARMAN, Judge:

Plaintiff, Mitsubishi International Corporation, challenges the classification and liquidation of its imported merchandise pursuant to section 515 of the Tariff Act of 1930, as amended, 19 U.S.C. § 1515(a) (1988). This Court has jurisdiction under 28 U.S.C. § 1581(a) (1988) and, for the reasons which follow, enters judgment for plaintiff.

## I. BACKGROUND

### A. The Continuous Steel Casting Process

All of the subject merchandise is involved in the continuous steel casting process. In general, the continuous steel casting process converts liquid metal into solid steel slabs through several steps. Transcript (Tr) at 30, 107. The process begins by placing molten steel in ladles and subjecting the molten steel to various conditioning treatments. *Id.* at 31. Following treatment, the molten steel flows from the ladles into a vessel known as a tundish. *Id.* at 32. A turret device controls the flow of the molten steel from the ladles into the tundish. *Id.* From the tundish, the steel pours into a mold in which the steel begins to solidify by forming a thin shell. *Id.* at 34–35. After the shell forms, the steel passes from the mold into a containment section consisting of several roller assemblies or roller segments. *Id.* at 35. Once in the containment section, the steel is sprayed with water in order to cause further solidification. *Id.* The roller segments in the containment section determine the dimensions of the hardening slabs and convey the slabs into a straightener/withdrawal unit which eliminates curves in the slabs. *Id.* The slabs then proceed to the torch table area in which a torch cut-off machine severs the slabs into pre-determined lengths. *Id.* at 37. After severance, the steel moves to a torch runout table for deburring and weighing. *Id.* Finally, the slabs pass to the piling area and then go into storage for eventual distribution. *Id.*

### B. The Merchandise

The merchandise at issue consists of fifteen components of a continuous steel casting

machine imported as part of a continuous steel casting plant.[1]  *Id.* at 26.  Each of the components, except for one,[2] was "specially designed to operate exclusively with the continuous casting machine for which they were imported."  Pre–Trial Order, Sched C ¶ 11.  The components and their functions may be described as follows:

### 1. *Ladle Rotator for Ladle Turret*

The ladle rotator for ladle turret is a large electromechanical device that contains bearings, rolls, frame and drive elements, such as gear boxes, gears, and electric motors.  *Id.* at 65.  The rotator serves to hold the ladles containing molten steel and to control the ladles' pivoting action during pouring.  *Id.* at 65–66.  The component weighs approximately forty to fifty tons and measures fifteen feet wide by twenty feet high.  *Id.*

### 2. *Segment Exchange Car*

The segment exchange car is also a large electromechanical device.  *Id.* at 67.  The car consists of wheels, drive elements, and control equipment for positioning.  *Id.* at 68.  The component is mounted on the casting machine and moves backward and forward over the bow of the caster.  *Id.* at 67.  The purpose of the car is to remove and replace segment from the casting machine should the segment in place fail or become damaged.  *Id.* at 67.  The component is approximately twenty to twenty-five feet long, eight feet wide, and fifteen feet high.  *Id.* at 68.

### 3. *Segment Swing Guide*

The segment swing guide is part of the continuous casting machine's segment removal system.  *Id.* at 68.  This component stands on either side of the casting machine and contains structural elements, hydraulic cylinders, cable, and a winch.  *Id.* at 68–69.  The swing guide works with the segment removal guide and pivots upon a fixed pivot point in response to the segment removal guide's movements.  *Id.* at 68.  The component is approximately twenty-five feet long, three feet wide, and two feet high, and weighs ten to fifteen tons.  *Id.* at 69.

### 4. *Segment Removal Guide*

The segment removal guide is also part of the continuous casting machine's segment removal system and is located on either side of the casting machine.  *Id.* at 69.  As its name suggests, the component's function is to guide the segment upon removal from the casting machine.  *Id.*  Operators bend and machine the removal guide to the exact position of the segment before removing the segment.  *Id.* at 69–70.  The component consists of structural steel and measures approximately forty feet long, two feet wide, and forty feet high.  *Id.*  The guide weighs sixty to eighty tons.  *Id.*

### 5. *Ladle Rotating Unit*

The ladle rotating unit operates during the pouring stage of the steel process and serves to orient the ladles' nozzles.  *Id.* at 70.  The unit contains very large bearings, driving elements, support bases, and bases upon which to place ladles.  *Id.*  The component measures twenty-five feet long, fifteen feet wide, and fifteen to twenty feet high, and weighs approximately thirty to forty tons.  *Id.*

### 6. *Tundish Car*

The tundish car supports, regulates, and transports the tundish—the vessel into which the ladles pour molten steel and from which the steel pours into the molds.  *Id.* at 32, 71.  In addition to positioning the tundish to receive molten steel from the ladles, the car has a lifting apparatus which regulates the depth of the nozzles of the tundish which extend into the molds.  *Id.* at 33.  The car is also equipped with a weight-sensing device that controls the amount of steel that can pass into the tundish.  *Id.*  Moreover, the component houses argon gas load cells used in pouring the molten steel and hydraulics that control the slide gate at the bottom of the tundish.  *Id.* at 32, 34, 71.  The tundish car measures forty feet long, twenty-five feet wide, and twelve feet high, and weighs approximately seventy to eighty tons.  *Id.* at 71.

---

1.  Before trial the parties stipulated to the classification of a sixteenth component, the roller segment with drive unit, under item 674.10, TSUS (1986).  Pre–Trial Order, Sched C ¶ 12.

2.  The single component not specially designed is the ladle rotator for ladle turret, which the parties described as "collateral equipment."  Pre–Trial Order, Sched C ¶ 13.

### 7. Tundish Lifting System

The tundish lifting system is the lifting apparatus contained in the tundish car that controls the height of the tundish. *Id.* at 71–72. The system itself consists of two motorized devices or frames located on both sides of the tundish and about fifteen feet apart. *Id.* at 73–74. The mechanized portion of each frame contains a gear box, motor, brakes, and position control. *Id.* at 73. Each frame measures four feet wide and five to six feet high, and together the frames weigh approximately ten to twenty tons. *Id.* at 73–74.

### 8. Heat Protector for Ladle Turret

The heat protector protects the casting machine, and the ladle turret in particular, against splashes and spills of molten steel. *Id.* at 75. The component has two parts, both of which consist of metal that is one quarter of an inch thick. *Id.* at 75–76. One part is located at the ladle turret's base and the other on the ladle turret's arm. *Id.* at 75. The former part is approximately thirty feet long and four feet high, and weighs nearly five tons. *Id.* The latter part measures six feet long and three feet wide. *Id.* at 76.

### 9. Torch Table

The torch table's function is to hold and convey steel slabs during the final forming operation when the torch cutting machine cuts the slabs into predetermined sizes. *Id.* The component consists of two frames on which rollers with bearings and drives are mounted. *Id.* The two frames are connected and have four wheels which are mounted on a rail. *Id.* The table measures approximately thirty-five feet long, five feet wide, and five feet high, and weighs thirty-five to forty tons. *Id.*

### 10. Mold and Mold Cover

The mold is a set of water-cooled copper plates that forms a rectangular shape into which molten steel is poured. *Id.* at 77. The plates' water-cooling system removes heat from the molten steel in order to initiate solidification and slab formation. *Id.* The mold is approximately twenty-five feet long, five feet wide, three feet high, and weighs about thirty-five tons. *Id.*

The mold cover has two parts. *Id.* at 78. The first part is a stationary piece affixed to the bottom portion of the mold. *Id.* This part seals the steam exhaust chamber located beneath the mold and enables the chamber to remove steam. *Id.* The second part is a moving piece attached to the top part of the mold. *Id.* This part oscillates in conjunction with the mold's continuous movements. *Id.* The function of this piece is to protect the mold and the casting machine's other equipment against spills that may occur from the tundish or ladles. *Id.* The cover is about twenty-five feet long, six feet wide, and three feet high, and weighs seven to ten tons. *Id.*

### 11. Mold Stopper Bracket

The mold stopper bracket is part of the mold and locates the mold on the casting machine's floor. *Id.* at 79. The bracket is two feet wide, one foot high, and six inches thick, and weighs approximately one hundred pounds. *Id.*

### 12. Slag Box

The slag box is an insulated metal box that stands on either side of the casting machine's mold. *Id.* The purpose of the box is to serve as a receptacle for molten steel in emergency situations. *Id.* at 34, 80. For example, in the event the steel flow from the tundish into the mold became uncontrollable, an operator could shift the tundish from casting position over the mold to a position over the slag box. *Id.* The component is approximately twenty feet long, five feet wide, and three feet deep. *Id.* at 80.

### 13. Roll Gap Measuring Device

The roll gap measuring device monitors the roller segments in the casting machine's containment section. The purpose of the device is to measure the gap formed by the roller segments and transmit the measurement to a computer which logs the segments' location. *Id.* at 81. This component measures three feet long, seventy-six inches wide, and nine inches high. *Id.* at 82.

### 14. Drive Roll Unit

The drive roll unit works in conjunction with the roller segments in the casting machine's containment section. *Id.* Each roller segment has two drive roll units which en-

able the segments to move slabs continuously through the machine. *Id.* As the machine casts the steel passing through the containment section, the drive roll units pinch the slab being cast and withdraw the slab from the machine. *Id.* Each unit contains a universal spindle, gear box, electric motor and brake, all of which are mounted on a support structure. *Id.* The component measures four feet long, three feet wide, and five feet high, and weighs approximately two tons. *Id.* at 82–83.

### 15. *Mold Pendant Box*

At the time of importation, the mold pendant box is an empty housing panel that is designed to hold the electronics, control devices, and displays which direct the casting process. *Id.* at 36, 83. Once the box is equipped, the box is mounted on a pivoting and swiveling arm affixed to the ladle operator platform. *Id.* at 83. This component is six feet wide, six feet tall, and two feet thick, and weighs approximately two tons before being equipped. *Id.*

### C. *Relevant Statutory Provisions*

Plaintiff relies on the following provisions of the Tariff Schedules of the United States (TSUS).

1. *Schedule 6, Part 4, Subpart F:*

  Item 674.10 Converters, ingot molds, and casting machines, all the foregoing of types used in metallurgy and in metal foundries, and parts thereof....

2. *General Headnotes and Rules of Interpretation:*

  10. *General Interpretative Rules:* For the purpose of these schedules—

  . . . .

  (ij) a provision for "parts" of an article covers a product solely or chiefly used as a part of such article, but does not prevail over a specific provision for such part.[3]

Defendant relies on the following TSUS provisions:

1. *Schedule 6, Part 4, Subpart B:*

  Item 664.10 Elevators, hoists, winches, cranes, jacks, pulley tackle, belt conveyors, and other lifting, handling, loading, or unloading machinery, and conveyors, all the foregoing and parts thereof not provided for in item 664.06, 664.07, or 664.08....

2. *Schedule 6, Part 4, Subpart F:* Molds of types used for metal (except ingot molds), for metallic carbides, for glass, for mineral materials, or for rubber or plastics materials (con.):

Item 680.13 Other....

3. *Schedule 6, Part 3, Subpart G, Headnote 1:* This subpart covers only articles of metal which are not more specifically provided for elsewhere in the tariff schedules.

4. *Schedule 6, Part 3, Subpart G:* Articles of iron or steel, not coated or plated with precious metal (con.):

  Other articles (con.):

  Other (con.):

  Item 657.25 Other: ....

5. *Schedule 7, Part 2, Subpart C:* Drafting machines, compasses, dividers, ruling pens, lettering pens (including fountain-pen type) used by draftsmen, pantographs, drawing curves, rulers, scribers, straight edges, disc calculators, slide rules, and other instruments, all the foregoing which are drawing, marking-out or mathematical calculating instruments; hand styluses; micrometers, calipers, gauges, balancing machines, and non-optical measuring or checking instruments, apparatus, and machines not specially provided for; and parts of the foregoing articles:

  . . . .

  Item 710.80 Other....

6. *Schedule 6, Part 4, Subpart J:* Gear boxes and other speed changers with fixed, multiple, or variable ratios; pulleys and shaft couplings; pillow blocks; flange, take-up, cartridge, and hanger units; torque converters; chain sprockets; clutches and universal joints; all the foregoing (except parts of agricultural or horticultural machinery and implements provided for in item 660.00 and

---

**3.** Defendant also relies on General Interpretative Rule 10(ij).

parts of motor vehicles and bicycles) and parts thereof:

Gear boxes and other speed changers, and parts thereof:

Fixed ratio speed changers, multiple and variable ratio speed changers each ratio of which is selected by manual manipulation, and parts thereof:

. . . .

Item 680.49 Other. . . .

7. *Schedule 6, Part 5:*

Item 685.90 Electrical switches, relays, fuses, lightning arresters, plugs, receptacles, lamp sockets, terminals, terminal strips, junction boxes and other electrical apparatus for making or breaking electrical circuits, for the protection of electrical circuits, or for making connections to or in electrical circuits; switchboards (except telephone switchboards) and control panels; all the foregoing and parts thereof. . . .

D. *Customs' Classifications*

The United States Customs Service (Customs) classified the subject components under various TSUS provisions. Customs' original classifications may be summarized as follows:

Item 664.10, TSUS:

(1) ladle rotator for laddle turret;

(2) segment exchange car;

(3) segment swing guide;

(4) segment removal guide;

(5) ladle rotating unit;

(6) tundish car;

(7) tundish lifting system;

(8) heat protector for laddle turret;

(9) torch table; and,

(10) drive roll unit.

Item 680.13, TSUS:

(1) mold and mold cover;

(2) mold stopper bracket; and,

(3) mold pendant box.

Item 657.25, TSUS:

(1) slag box.

Item 710.80, TSUS:

(1) roll gap measuring device.

Pre–Trial Order, Sched D–2, E–2 ¶ 1; Sched F ¶¶ 1–4. Based on information obtained during discovery, Customs subsequently changed its classification of the drive roll unit and mold pendant box to items 680.49 and 685.90, TSUS, respectively. *Id.* at Sched D–2, E–2 ¶ 1; Sched F ¶¶ 5–6.

Plaintiff filed timely protests pursuant to 19 U.S.C. § 1514(a) (1988) to contest Customs' classifications. Customs subsequently denied the protests under 19 U.S.C. § 1515 (1988) and, after having paid all liquidated duties, plaintiff commenced this action within the time allowed by law. This Court has jurisdiction under 28 U.S.C. § 1581(a) (1988).

II. Contentions of the Parties

A. *Plaintiff*

Plaintiff advances several arguments in support of its position. First, plaintiff argues that General Interpretative Rule (GIR) 10(ij) requires Customs to classify the merchandise under item 674.10. According to plaintiff, the "parts" definition contained in GIR 10(ij) includes articles that, at the time of importation, "are dedicated solely for use" upon another article, citing *United States v. Pompeo*, 43 CCPA 9, 14, C.A.D. 602, 1955 WL 6859 (1955). Plaintiff urges that because the subject components were "dedicated solely for use" upon a continuous casting machine, the components are parts of casting machines under item 674.10.

Second, plaintiff claims the components' primary function and sole reason for importation were for use as parts of a continuous steel casting machine. Plaintiff maintains that whatever general handling functions the components may be able to perform are ancillary to the components' principal use as parts of a continuous steel casting machine, citing *United States v. DeLaval Separator Co.*, 65 CCPA 48, 50–51 C.A.D. 1204, 569 F.2d 1134, 1135–36 (1978). Therefore, plaintiff asserts, the components' non-casting machine functions do not preclude classification under item 674.10 as parts of casting machines.

Third, plaintiff contends the items under which Customs classified the merchandise do not more specifically provide for the mer-

chandise than item 674.10. In essence, plaintiff asserts that Customs incorrectly interpreted GIR 10(ij). Plaintiff acknowledges that GIR 10(ij) requires Customs to classify "parts" under the TSUS item that specifically provides for the parts or that provides for the parts eo nomine.[4] Plaintiff claims, however, the items relied upon by Customs are "sweeping in scope" rather than specific and that the eo nomine exemplars used in these items do not encompass plaintiff's merchandise, citing DeLaval, 65 CCPA at 50, 569 F.2d at 1136. According to plaintiff, because Customs used broad-based items and items whose eo nomine exemplars do not include the components at issue, item 674.10's provisions for "casting machines" and "parts thereof" demonstrate that item 674.10 more specifically provides for the components than the items selected by Customs. As a result, plaintiff maintains that none of the items that Customs chose is a "specific provision" applicable to the subject merchandise within the meaning of GIR 10(ij).

Finally, plaintiff urges that the "more than" doctrine requires Customs to classify the merchandise under item 674.10. According to plaintiff, the "more than" doctrine precludes Customs from classifying an article under an eo nomine provision for the article if the article is "more than" the items described by the provision. As applied to this case, plaintiff argues that because each component's major function is to "perform together as a single, integrated and customized casting machine," Customs' reliance on more generalized provisions for "handling" and "conveying equipment," and "articles of iron or steel," is inconsistent with the "more than" doctrine. In short, plaintiff asserts that the items upon which Customs relies overly simplify the components' functions and overlook the fact that the components' sole application is in the continuous steel casting machine. Moreover, plaintiff claims that because the subject components differ from, or are "other than," the eo nomine exemplars found in the TSUS items selected by Customs, the components are clearly "more than" the articles described by those

items, citing W.Y. Moberly, Inc. v. United States, 13 CIT 502, 510, 727 F.Supp. 1456, 1462 (1989), aff'd, 924 F.2d 232 (1991).

## B. Defendant

Defendant contends Customs properly classified the imported components under items 664.10, 680.13, 657.25, 710.80, 680.49, and 685.90. The crux of defendant's position is that each of these items specifically provides for the subject components and therefore, under GIR 10(ij), these items should prevail over the more general "parts" provisions upon which plaintiff relies. Defendant devotes most of its argument to demonstrating that the TSUS items selected by Customs are "specific" within the meaning of GIR 10(ij) and that these items more specifically provide for the subject components than the items suggested by plaintiff.

First, defendant claims the specificity of the items chosen by Customs appears in each item's totality rather than in each item's individual parts. For example, defendant maintains the "lifting, handling, loading, or unloading" functions or uses described in item 664.10 should be considered in conjunction with the types of articles described in the item, namely "elevators, hoists, winches, cranes, jacks, pulley tackle, [and] belt conveyors." Defendant appears to suggest that, when viewed together, the article and use descriptions show the item specifically provides for the articles named and all articles that have the uses described by the item.

Alternatively, defendant asserts that, even when read in isolation, the use provisions of item 664.10 are more specific than the "parts" provisions upon which plaintiff relies, citing Robert Bosch Corp. v. United States, 63 Cust.Ct. 187, 192–93, C.D. 3,895, 305 F.Supp. 921, 924–26 (1969). In addition, defendant claims that despite the fact that the use provisions may be generic, the generic terms contained in 664.10 are more specific than the "parts" provisions advanced by plaintiff for purposes of GIR 10(ij), citing Bosch, 63 Cust.Ct. at 193, 305 F.Supp. at 925.

4. "An eo nomine designation is one which describes a commodity by a specific name, usually one well known to commerce." RUTH F. STURM, CUSTOMS LAW AND ADMINISTRATION, § 53.2, at 3 (3d ed. 1991) (citing United States v. Bruckmann, 65 CCPA 90, C.A.D. 1211, 582 F.2d 622 (1978)).

In addition, defendant argues that the subject components' handling, lifting, loading, and unloading operations are the components' primary functions within the meaning of item 664.10. For example, defendant notes that the primary function of the tundish lifting system is to lift the tundish and, as such, is within the purview of item 664.10. Moreover, defendant claims item 664.10 applies to all articles described by the item regardless of whether the article performs the described functions in a general or specific manner, citing *Amalgamated Sugar Co. v. United States,* 60 Cust.Ct. 268, C.D. 3,361, 281 F.Supp. 373 (1968). Therefore, according to defendant, the mere fact that the components perform the functions delineated in item 664.10 in the specific context of a continuous steel casting machine does not preclude classification of the components under the item.

Finally, defendant addresses three components individually. With respect to the slag box, defendant urges Customs properly classified the article under item 657.25. Although defendant acknowledges item 657.25 "is not a 'specific provision'" within the meaning of GIR 10(ij) and the slag box is "indisputably essential for safe operation of the casting line," defendant nevertheless claims the slag box is not a casting machine part because it is not actually involved in the casting process. With respect to the roll gap measuring device and mold pendant box, defendant argues that items 710.90 and 685.90, respectively, specifically provide for the components and thus preclude classification under item 674.10, citing Schedule 6, Part 4, Headnote 1(v). Moreover, defendant asserts plaintiff failed to rebut the evidence of record showing that items 710.90 and 685.90, respectively, describe the roll gap measuring device and mold pendant box.

## III. Discussion

### A. *Presumption of Correctness*

As in all customs cases, a statutory presumption of correctness attaches to classifications by the Customs Service and the party challenging the classification has the burden of overcoming this presumption. 28 U.S.C. § 2639(a)(1) (1988). To determine whether an importer has overcome the statutory presumption, the Court must consider whether "the government's classification is correct, both independently and in comparison with the importer's alternative." *Jarvis Clark Co. v. United States,* 2 Fed.Cir. (T) 70, 75, 733 F.2d 873, 878, *reh'g denied,* 2 Fed.Cir. (T) 97, 739 F.2d 628 (1984).

### B. *Application of General Interpretative Rule 10(ij)*

■ In order to apply GIR 10(ij) to the subject merchandise, the Court must conduct a two-part inquiry. GIR 10(ij) indicates that "a provision for 'parts' of an article covers a product solely or chiefly used as a part of such article, but does not prevail over a specific provision for such part." GIR 10(ij). Whereas the rule's first clause provides a basic definition for "parts," the rule's second clause indicates how to classify a part when more than one tariff item provides for the part. *See, e.g., DeLaval,* 65 CCPA at 49–50, 569 F.2d at 1135–36 (deciding whether imported farm tanks are "parts" of refrigerators before determining which of the competing tariff items should prevail). The second clause, therefore, is only applicable when a "part" is in issue.

Accordingly, before the Court may consider whether the TSUS items selected by Customs more specifically provide for the subject merchandise under the second clause of GIR 10(ij), the Court must first determine whether the components are "parts" under GIR 10(ij)'s first clause. Because this determination requires the Court to consider the article for which plaintiff imported the components—the continuous steel casting machine—, the Court must also decide whether the components are casting machine parts under item 674.10. For the reasons which follow, the Court concludes that the subject components are "parts" under GIR 10(ij) and casting machine parts under item 674.10. The Court concludes further that the various TSUS items chosen by Customs do not more specifically provide for the components and that the components are properly classifiable as casting machine parts under item 674.10.

### 1. *"Parts" Inquiry*

GIR 10(ij) requires the Court to make a threshold inquiry as to whether the subject components are "parts" within the purview of GIR 10(ij). Case law has clarified the "parts" inquiry necessitated by the first clause of GIR 10(ij). In order to decide whether an item is "solely or chiefly used as a part of [an] article," the Court must consider the "nature, function and purpose of an item in relation to the article to which it is attached or designed to serve." *Ideal Toy Corp. v. United States*, 58 CCPA 9, 13, C.A.D. 996, 433 F.2d 801, 803 (1970) (citing *Gallagher & Ascher Co. v. United States*, 52 CCPA 11, 13–14, C.A.D. 849, 1964 WL 8616 (1964)). In general, "a 'part' of an article is something necessary to the completion of that article.... [I]t is an integral, constituent, or component part, without which the article to which it is joined, could not function as such article." *Gallagher*, 52 CCPA at 14 (citing *United States v. Willoughby Camera Stores*, 21 CCPA 322, 324, T.D. 46,851, 1933 WL 1887 (1933)). Nevertheless, the mere "fact that the article operates, functions or can be used without the item is not determinative." *Ideal Toy*, 58 CCPA at 13, 433 F.2d at 803 (citing *Trans Atlantic Co. v. United States*, 48 CCPA 30, C.A.D. 758, 1960 WL 8476 (1960)).

In this case, plaintiff has amply demonstrated that each of the subject components is integral to the casting machine's operation. Plaintiff introduced several exhibits which indicate that each of the subject components has a specialized and necessary function in the overall casting process. *See* Pl's Exhibs 1–2, 4, 6–7. The exhibits emphasize each component's particular contribution to the casting process in order to explain the casting machine's operation. In addition, plaintiff's expert witness thoroughly described the components' specialized functions within the overall casting process. Tr at 31–39, 65–83. These descriptions, set out in detail above, show that each of the components plays an essential and unique role in the casting machine's operation and in the overall casting process.

Defendant, on the other hand, did not offer any evidence which disputed plaintiff's expert's descriptions. More significant, however, is the fact that defendant's expert witness expressly agreed with plaintiff's expert witness' characterization of each component's function and of the casting process. Tr at 121. Moreover, while defendant asserts in its papers that the slag box (component number twelve) is not a casting machine part because it is not involved in the casting process, defendant and its expert both indicated that the safety features provided by the component are integral to the casting process. Def's Post–Trial Brief at 10; Tr at 119–20. Notwithstanding defendant's and defendant's expert's positions, even assuming the slag box is not *per se* involved in the casting process and the process could occur without the slag box, the fact that slag box's sole purpose is to secure the casting machine's operation is enough to establish that the component is integral to the machine. *See Ideal Toy*, 58 CCPA at 13, 433 F.2d at 803. Because all of the subject components satisfy a specific and integral need in the casting machine's operation, the Court concludes that all of the components are "parts" under GIR 10(ij) and casting machine parts under item 674.10. *See id.; Gallagher*, 52 CCPA at 14, 1964 WL 8616.

The fact that the subject components are "dedicated for use" in the casting machine further compels this conclusion. Where items are "dedicated for use" upon an article and can not apply to any other purpose, courts have generally found the items to be parts of the article for which they were imported. *See Pompeo*, 43 CCPA at 13, 1955 WL 6859; *Ideal Toy Corp. v. United States*, 63 Cust.Ct. 406, 411, C.D. 3926 (1969). In *Pompeo*, the Court of Customs and Patent Appeals (CCPA) addressed the issue of whether engine superchargers for Ford and Austin automobiles were automobile parts. The Customs Court had held that the superchargers were automobile parts based upon, in part, the following findings: (1) "the imported superchargers [were] designed specifically for use on automobiles;" (2) "the Ford engine and the Austin engine will operate if no supercharger has been installed therein;" and (3) "once a supercharger has been installed ... the engine will not operate if the

supercharger fails." *Pompeo*, 43 CCPA at 10–11, 1955 WL 6859. The CCPA affirmed the trial court's holding, reasoning that "where an article at time of importation is dedicated to a specific use, the question of whether the article is a part must be determined from the nature of the article as applied to that use." *Id.* at 14. Because the superchargers were dedicated for use in the Ford and Austin engines and the engines could not operate if the superchargers were to fail after installation, the appellate court concluded that the superchargers were automobile parts. *Id.* at 14.

Similar to *Pompeo*, the record in this case is replete with evidence demonstrating that the subject components are dedicated for use in the casting machine for which they were imported. As previously indicated, the parties stipulated that all of the components except for the ladle rotator for ladle turret were "specially designed to operate exclusively with the continuous casting machine for which they were imported." Pre–Trial Order, Sched C ¶ 11. This stipulation by itself clearly indicates that plaintiff imported the components, except for the ladle rotator for ladle turret, solely for use in the continuous casting machine. Notwithstanding the exception for the ladle rotator for ladle turret in the parties' stipulation, defendant's expert witness testified during trial that all of the components, including the ladle rotator for ladle turret, were customized for use in the casting machine for which they were imported and could not be used in any other machine without alteration. Tr at 129–31. Because the parties' stipulation and defendant's expert's testimony indisputably show that, as imported, the subject components can only function in the casting machine, the Court finds that the components are "dedicated for use" in and are parts of the casting machine for which they were imported. *See Pompeo*, 43 CCPA at 13, 1955 WL 6859. Accordingly, the Court concludes that all of the components are "parts" under GIR 10(ij) and casting machine parts under item 674.10.

### 2. Specific Inquiry

■ The Court now turns to the second clause of GIR 10(ij) in order to determine whether the various TSUS items selected by Customs more specifically provide for the subject components so as to preclude the application of item 674.10.[5] For the reasons which follow, the Court concludes that none of the items chosen by Customs more specifically provides for the components than item 674.10 and that all of the components are classifiable under item 674.10.

#### a. Components Classified Under Item 664.10

Customs classified nine of the subject components under item 664.10. These components include the following: (1) ladle rotator for laddle turret; (2) segment exchange car; (3) segment swing guide; (4) segment removal guide; (5) ladle rotating unit; (6) tundish car; (7) tundish lifting system; (8) heat protector for laddle turret; and, (9) torch table. Item 664.10 applies to "[e]levators, hoists, winches, cranes, jacks, pulley tackle, belt conveyors, and other lifting, handling, loading, or unloading machinery, and conveyors, all the foregoing and parts thereof not provided for in item 664.06, 664.07, or 664.-08 . . . ."

Defendant contends that the use functions described in item 674.10, such as "lifting, handling, loading, or unloading," more specifically provide for the subject components than item 664.10's parts provision. To support its position, defendant cites the Customs Court's decision in *Bosch*, 63 Cust.Ct. at 187, 305 F.Supp. at 921. The *Bosch* court considered whether an automobile radio and radio antenna were properly classifiable as automobile parts under item 692.27 or as radiotelegraphic and radiotelephonic transmission and reception apparatus under item 685.22. *Id.* at 187, 305 F.Supp. at 921–22. The court held that item 685.22 more specifically provided for the merchandise within the meaning of GIR 10(ij) than item 692.27 and therefore precluded item 692.27 from applying to the merchandise. *Id.* at 191, 305 F.Supp. at

---

5. As indicated previously, item 674.10 encompasses "[c]onverters, ingot molds, and *casting machines*, all the foregoing of types used in me-

tallurgy and in metal foundries, and *parts thereof* . . . ." (Emphasis added).

925. In reaching its holding, the *Bosch* court emphasized that a generic term for an article will satisfy GIR 10(ij)'s specificity requirement and found that item 685.22's provisions for "radiotelegraphic and radiotelephonic transmission and reception apparatus" were generic terms that specifically provided for the radio and radio antenna at issue. *Id.* at 193, 305 F.Supp. at 924–25. Defendant suggests that item 664.10's provisions for "lifting, handling, loading, or unloading machinery" are generic terms which, like item 685.-22's provisions for "radiotelegraphic and radiotelephonic transmission and reception apparatus" satisfy GIR 10(ij)'s specificity requirement and preclude classification under 674.10.

Defendant's reliance on *Bosch* is misplaced. This Court interprets *Bosch* to have concluded that item 685.22's provision for "radiotelegraphic and radiotelephonic transmission and reception apparatus" applied to the automobile radio and antenna at issue because the provision's terminology embraced all radio apparatus, even though the item did not specify car radio apparatus. *See id.* at 191–93, 305 F.Supp. at 924–26. *Bosch* did not employ the term "generic" in the broad sense suggested by defendant. Rather, the court used the term to describe how item 685.22 identifies a class of specifically-defined equipment. *Id.* at 191, 305 F.Supp. at 924 (Congress "has merely substituted more sophisticated terminology for that in common use, but in so doing has not obscured the identity of the articles it intended to include."). Defendant's application of *Bosch* to the instant case would render item 674.10 and, conceivably, numerous other parts provisions meaningless. *See, e.g., United States v. General Elec. Co.,* 58 CCPA 152, 156, C.A.D. 1021, 441 F.2d 1186, 1189 (1971) ("[A] seemingly broad descriptive tariff term is not to be taken as encompassing every article which may literally come within that term . . . ."). In sum, the terms "lifting, handling, loading, or unloading machinery" do not describe "a special or particular sort or kind of thing" in a manner that satisfies the specificity requirement contained in GIR 10(ij). *Bosch,* 63 Cust.Ct. at 191, 305 F.Supp. at 924.

The merchandise and TSUS items at issue in the instant case are akin to the merchandise and items addressed in *DeLaval,* 65 CCPA at 48, 569 F.2d at 1134. In *DeLaval,* the CCPA considered whether refrigerator tanks were properly classifiable as refrigerator parts under item 661.35 or as "on-farm equipment for the handling or drying of agricultural or horticultural products, and agricultural and horticultural implements not specially provided for, and any parts of the foregoing" under item 666.00. *Id.* at 49, 569 F.2d at 1136. The court held that item 666.00 did not more specifically provide for the merchandise because the item's provisions "encompass countless other products which find utility on a farm" and are, therefore, "sweeping in scope." *Id.* at 50, 569 F.2d at 1136. The court also reasoned that neither of item 666.00's provisions was an *eo nomine* or "specific provision" for the subject merchandise as that term is used in GIR 10(ij). *Id.* at 51, 569 F.2d at 1136.

Similar to the item discussed in *DeLaval,* item 664.10 lacks the specificity necessary to preclude the application of item 674.10. As with item 666.00 in *DeLaval,* item 664.10's language clearly "encompass[es] countless other products" and is "sweeping in scope." *Id.,* 569 F.2d at 1136. Defendant's interpretation of item 664.10 would enable the item to embrace virtually *any* mechanized device that performs any kind of "lifting, handling, loading, or unloading" function. Such a literal interpretation improperly glosses over the specialized functions such devices may perform *in addition to the functions described in the item* and which, as in the instant case, are highly germane to the devices' classification. As a result, the Court concludes item 664.10 does not specifically provide for the subject components and classification is proper under item 674.10.[6] Moreover, the fact

---

6. Contrary to defendant's suggestion, nothing in the Tariff Commission's studies establishes the specificity of item 664.10. *See* United States Tariff Comm'n, Tariff Classification Study, Seventh Supplemental Report 99 (1963) (noting that a "parts" provision is not more specific than a provision for, among other items, "illuminating articles"). Item 664.10's provisions for "lifting, handling, loading, or unloading machinery" are clearly *not* as specific as the "illuminating arti-

that item 664.10's provisions for "lifting, handling, loading, or unloading machinery" are not *eo nomine* further supports the Court's conclusion that the item is not specific within the meaning of GIR 10(ij). *See id.*

b. Components Classified Under Item 680.49

Customs classified one component under item 680.49, the drive roll unit. Item 680.49 applies to the following merchandise:

> Gear boxes and other speed changers with fixed, multiple, or variable ratios; ... all the foregoing ... and parts thereof: Gear boxes and other speed changers, and parts thereof: Fixed ratio speed changers, multiple and variable ratio speed changers each ratio of which is selected by manual manipulation, and parts thereof: ... Item 680.49 Other....

The evidence received by the Court pertaining to the drive roll clearly indicates item 680.49 does not more specifically provide for the drive roll unit than item 674.10. By its terms, item 680.49 embraces, among other items, gear boxes and other speed changers. Yet, as discussed previously, the testimony of both plaintiff's and defendant's expert witnesses indicated that the drive roll unit contains, *in addition to a gear box*, a universal spindle, electric motor and brake. Tr at 82, 121. Moreover, the component functions in a manner that is inconsistent with an article that only contains a gear box or speed changer. Defendant's expert witness testified that the drive roll unit pinches the steel slabs and brakes the slabs' motion so as to prevent the slabs from escaping from the molds. *Id.* at 116. Even assuming the component's gear box controlled the pinching and braking actions described by defendant's expert, the fact that the component performs these actions demonstrates that the component is not merely a gear box or speed changer within item 680.49. *See United States v. Sutherland Int'l Despatch*, 21 CCPA 264, 266–68, T.D. 46,790, 1933 WL 1881 (1933) (finding that window channels consisting of a brass

channel and felt lining are outside the purview of the *eo nomine* description of "channels" because the channels' elements and uses are more than the description provided); *Moberly*, 13 CIT at 510, 727 F.Supp. at 1462. As a result, the Court finds item 680.49 does not adequately describe the drive roll unit and, therefore, does not more specifically provide for the component than item 674.10. Accordingly, the Court concludes the component is properly classifiable under item 674.10.

c. Components Classified Under Item 680.13

Customs classified two of the components under item 680.13, the mold and mold cover, and the mold stopper bracket. Item 680.13 applies to the following articles: "Molds of types used for metal (except for ingot molds), for metallic carbides, for glass, for mineral materials, or for rubber or plastics materials (con.): Item 680.13 ... Other...."

The evidence before the Court does not support Customs' classification under item 680.13. As is pertinent to this case, the word "mold" commonly describes, among other items, "a cavity in which a fluid or malleable substance is given form...." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1454 (1st ed 1986). The evidence received by the Court indicates the two components at issue are more than mere cavities "in which a fluid or malleable substance is given form." As explained by plaintiff's expert witness, in addition to shaping the molten steel, the mold itself removes heat from the steel in order to initiate solidification and slab formation. Tr at 77. The mold cover, on the other hand, does not perform any shaping functions whatsoever. The cover seals the steam exhaust chamber located beneath the mold, enables the chamber to remove steam, and protects the mold and other equipment from steel spills. *Id.* at 78. Likewise, the mold stopper bracket fixes the mold on the casting machine's floor, but does not shape the steel

---

cles" which the Tariff Commission found to be more specific than a "parts" provision. The terms "illuminating articles," like the terms "radiotelegraphic and radiotelephonic transmission and reception apparatus" discussed in *Bosch*, generically describe an entire class of articles—

lamps. As discussed above, item 664.10 does not generically describe a class of articles; it only describes a particular kind of function that any number of articles may perform. Accordingly, the Court finds defendant's reliance on the Tariff Commission's studies to be misplaced.

in any manner. *Id.* at 79. Defendant did not offer any evidence to contradict plaintiff's expert's testimony. *See id.* at 106. Moreover, defendant's expert witness expressly agreed with plaintiff's expert's descriptions. *Id.* at 121. Accordingly, the Court finds item 680.13 does not adequately describe the mold and mold cover, and the mold stopper bracket and, therefore, does not more specifically provide for the components than item 674.10. Thus, the Court concludes the components are properly classifiable under item 674.10.

d. Components Classified Under Item 685.90

Customs classified one component under item 685.90, the mold pendant box. Item 685.90 applies to the following merchandise:

> Electrical switches, relays, fuses, lightning arresters, plugs, receptacles, lamp sockets, terminals, terminal strips, junction boxes and other electrical apparatus for making or breaking electrical circuits, for the protection of electrical circuits, or for making connections to or in electrical circuits; switchboards (except telephone switchboards) and control panels; all the foregoing and parts thereof. . . .

The evidence before the Court does not support Customs' classification of the mold pendant box under item 685.90. Though defendant's expert characterized the component as a "control panel" that holds the controls for the mold for oscillation cycles and tundish car,[7] the evidence received by the Court militates against such a narrow characterization. The totality of the evidence presented by plaintiff clearly indicates the component is an integral part of the overall steel casting process and has no other function but in the casting machine for which it was imported. *See id.* at 11, 83. In short, the mold pendant box is essential to the safe and controlled operation of the casting machine. Because item 685.90's terms do not encompass the mold pendant box's essential functions, the Court finds the item does not more specifically provide for the component than item 674.10's provision for casting machine parts. *See Sutherland,* 21 CCPA at 266–68, 1933 WL 1881; *Moberly,* 13 CIT at 510, 727 F.Supp. at 1462. As a result, the Court concludes that the mold pendant box is properly classifiable under item 674.10.

e. Components Classified Under Item 657.25

Customs classified the slag box under item 657.25. This item applies to "[a]rticles of iron or steel, not coated or plated with precious metal (con.): Other articles (con.): Other (con.): Other: . . . ." A related provision, Schedule 6, Part 3, Subpart G, Headnote 1 (Headnote 1), indicates that item 657.25 "covers only articles of metal *which are not more specifically provided for elsewhere in the tariff schedules.*" (Emphasis added).

The Court's previous finding that the slag box is a casting machine part under item 674.10 compels the conclusion that item 657.25 does not specifically provide for the component under GIR 10(ij). The only evidence defendant offered with respect to the slag box was the testimony of its expert indicating that the component is a "metal box" that is not part of the continuous casting machine. Tr at 106. As discussed previously, however, plaintiff amply demonstrated that the component *is* involved in the casting process and, because it provides an integral safety feature for the safe operation of the casting machine, is a casting machine part under item 674.10. The fact that the slag box performs a distinct and integral safety function in the casting machine also indicates the component is not merely a "metal box" and distinguishes the component from the general class of articles to which item 657.25 applies. As a result, the Court concludes item 674.10 more specifically provides for the slag box than item 657.24 and the component is properly classifiable under item 674.10.

f. Components Classified Under Item 710.80

Customs classified the final component at issue, the roll gap measuring device, under item 710.80. This item applies to the following merchandise:

> Drafting machines, compasses, dividers, ruling pens, lettering pens (including fountain-pen type) used by draftsmen, pantographs, drawing curves, rulers, scribers, straight edges, disc calculators, slide rules,

---

7. Tr at 106.

and other instruments, all the foregoing which are drawing, marking-out or mathematical calculating instruments; hand styluses; micrometers, calipers, gauges, balancing machines, and non-optical measuring or checking instruments, apparatus, and machines not specially provided for; and parts of the foregoing articles: .... Other....

The evidence before the Court does not support Customs' classification of the roll gap measuring device under item 710.80. Plaintiff adequately demonstrated that the roll gap measuring device is integral to the casting machine's functioning. The testimony of both plaintiff's and defendant's expert witnesses indicates that the device measures and records the gap formed by the casting machine's roller segments and conveys the measurements to a computer which monitors the segments' location. Tr at 81–82, 107. This testimony establishes that, in addition to measuring the roller segments, the device interacts with the casting machine's computers, thereby facilitating the machine's overall operations. In sum, the testimony shows the component is more than any of the articles described in item 710.80. *See Sutherland,* 21 CCPA at 266–68, 1933 WL 1881; *Moberly,* 13 CIT at 510, 727 F.Supp. at 1462. Because item 710.80 does not encompass the functions performed by the roll gap measuring device, the Court finds the item does not more specifically provide for the component than item 674.10. As a result, the Court concludes the component is properly classifiable under item 674.10.

## IV. CONCLUSION

The Court holds that plaintiff has overcome the statutory presumption of correctness attached to Customs' classification of the components under items 664.10, 680.13, 657.25, 710.80, 680.49, and 685.90, TSUS. The Court holds further that plaintiff has demonstrated that all of the components are properly classifiable under item 674.10, TSUS.

## ORDER

This case having been duly submitted for decision, and the Court after due deliberation, having rendered a decision herein; now, in conformity with said decision it is hereby

ORDERED that the classification of the subject merchandise by the United States Customs Service under items 664.10, 680.13, 657.25, 710.80, 680.49, and 685.90, TSUS, is reversed; and it is further

ORDERED that the United States Customs Service shall reliquidate the subject merchandise under item 674.10, TSUS (1986) or (1987), depending on date of entry, and shall refund all excess duties with interest as provided by law.

