**MITSUBISHI INTERNATIONAL CORPORATION, Plaintiff,**

v.

**UNITED STATES, Defendant.**

**Slip Op. 98–43.**
**Court No. 95–05–00695.**

United States Court of International Trade.

April 9, 1998.

Barnes, Richardson & Colburn (Sandra Liss Friedman, Frederic D. Van Arnam, Jr.), New York City, for Plaintiff.

Frank W. Hunger, Assistant Attorney General of the United States; Joseph I. Liebman, Attorney–in–Charge, International Trade Field Office, Commercial Litigation Branch, Civil Division, United States Department of Justice (Barbara Silver Williams), Chi S. Choy, Office of Assistant Chief Counsel, International Trade Litigation, United States Customs Service, of Counsel, Washington, DC, for Defendant.

## OPINION

CARMAN, Chief Judge.

This case is before this Court on cross-motions for summary judgment pursuant to U.S. CIT R. 56. Plaintiff, Mitsubishi International Corporation ("Mitsubishi"), challenges the United States Customs Service's ("Customs") classification of the merchandise at issue under several different subheadings of the Harmonized Tariff Schedule of the United States ("HTSUS")[1]. Plaintiff argues the merchandise at issue is properly classified in subheading 8454.90.00, HTSUS, as "Converters, ladles, ingot molds and casting machines, of a kind used in metallurgy or in metal foundries and parts thereof: Parts ... Of casting machines", free of duty. Plaintiff

[1]. The HTSUS provisions cited by the Court appear in HTSUS (2nd ed.1990) and HTSUS

requests this Court order Customs to reclassify plaintiff's entries under subheading 8454.90.00, HTSUS, as parts of casting machines and refund all excess duties with interest as provided by law.

Defendant cross moves for summary judgement, requesting this Court deny plaintiff's motion and dismiss this action. Defendant argues as all of the merchandise at issue, except for the segment stand test, are goods properly classified within chapters 84 and 85, HTSUS, Customs correctly classified the merchandise.

This Court has jurisdiction under 28 U.S.C. § 1581(a) (1994) and this action is before the Court for *de novo* review under 28 U.S.C. § 2640(a)(1) (1994). For the reasons which follow, this Court grants in part and denies in part plaintiff's Motion for Summary Judgment and grants in part and denies in part defendant's Cross–Motion for Summary Judgment.

## BACKGROUND

A. *Subject Merchandise*

Plaintiff is the importer of the merchandise at issue in this case, consisting of twenty-five articles which comprise components of a continuous steel casting machine. The merchandise at issue originated in Japan, and was entered at the Port of New Orleans in five shipments on or about January 4, March 21, March 22, and July 31, 1990 and April 16, 1991.

Continuous steel casting is a process whereby liquid steel is converted to a solid slab with or possessing a defined shape through a continuous, non-interrupted process. In the continuous casting process, molten steel is placed in ladles and is subjected to various conditioning treatments. Following treatment, the molten steel flows from the bottom of the ladle into a vessel known as the tundish. A turret device controls the flow of the molten steel from the ladles into the tundish. An opening at the bottom of the tundish feeds the liquid steel into a mold,

(1991).

in which the steel begins to solidify by forming a thin shell. After the shell forms, the steel slab is pulled from the mold into a containment section consisting of roller assemblies or roller segments. From there the steel slab is conveyed over a series of roller conveyors called "tables" where it is first cut into discrete pre-determined lengths by a torch cutting machine, deburred and weighed on the torch runout table, and then taken off the line for storage and eventual distribution. (*See generally* Pl.'s Stmt of Mat. Facts Not in Dispute ("Pl.'s Facts"); Def.'s Resp to Pl.'s Stmt of Mat. Facts ("Def.'s Resp.")); *see also Mitsubishi International Corp. v. United States,* 17 CIT 871, 872, 829 F.Supp. 1387,

1388 (1993), *appeal dismissed,* 22 F.3d 1102, 1993 WL 533148 (Fed.Cir.1994) ("*Mitsubishi*").

Plaintiff entered the imported merchandise under subheading 8454.90.00, HTSUS, as "Converters, ladles, ingot molds and casting machines, of a kind used in metallurgy or in metal foundries, and parts thereof: Parts ... Of casting machines", free of duty. Customs classified the merchandise at issue under several different subheadings of the HTSUS, based upon the identity and function of each article. The following chart lists the components and the subheadings under which they were classified.

| Component | Plaintiff's Claimed Classification | Customs' Classification | Year(s) of Entry |
|---|---|---|---|
| 1) Torch Approach Table | 8454.90.00 | 8428.39.00 | 1990 |
| 2) Torch Roller Table | 8454.90.00 | 8428.39.00 | 1990 |
| 3) Torch Runout Table | 8454.90.00 | 8428.39.00 | 1990 |
| 4) Slab Transfer Table | 8454.90.00 | 8428.39.00 | 1990 |
| 5) Segment Changer System | 8454.90.00 | 8428.90.00 | 1990 |
| 6) Ladle Turret | 8454.90.00 | 8428.90.00 | 1990 |
| 7) Tundish Transfer Car | 8454.90.00 | 8428.90.00 | 1990 |
| 8) Ladle–to–Tundish Shroud Changing Mechanism | 8454.90.00 | 8428.90.00 | 1990 |
| 9) Segment Transfer Car | 8454.90.00 | 8428.90.00 | 1990 |
| 10) Tundish Lifting Beam | 8454.90.00 | 8428.90.00 | 1990 |
| 11) Mold and First Zone Lifting Beam | 8454.90.00 | 8428.90.00 | 1990 |
| 12) Segment Lifting Beam | 8454.90.00 | 8428.90.00 | 1990 |
| 13) No. 3—No. 7 Segment Drive Units | 8454.90.00 | 8483.40.50 | 1990 |
| 14) No. 8—No. 13 Segment Drive Units | 8454.90.00 | 8483.40.50 | 1990 |
| 15) Torch Roller Table Reducer with Coupling | 8454.90.00 | 8483.40.50 | 1990 |

| Component | Plaintiff's Claimed Classification | Customs' Classification | Year(s) of Entry |
|---|---|---|---|
| 16) Torch Runout Table Reducer with Gear Coupling | 8454.90.00 | 8483.40.50 | 1990, 1991 |
| 17) Torch Roller Table Roller (with bearing housing) | 8454.90.00 | 8431.39.00 | 1990 |
| 18) Torch Runout Table Roller (with bearing housing) | 8454.90.00 | 8431.39.00 | 1990 |
| 19) Roll Assemblies for Torch Approach Table | 8454.90.00 | 8431.39.00 | 1991 |
| 20) Roll Assemblies for Torch Roller Table | 8454.90.00 | 8431.39.00 | 1991 |
| 21) Deburring Table | 8454.90.00 | 8460.90.00 | 1990 |
| 22) Tundish Nozzle Preheat Station | 8454.90.00 | 8419.89.50 | 1990 |
| 23) Tundish Car Limit Switch | 8454.90.00 | 8536.50.00 | 1990 |
| 24) Tundish Skull Punching | 8454.90.00 | 6903.90.00 | 1990 |
| 25) Segment Test Stand | 8454.90.00 | 9031.80.00 | 1990 |

Plaintiff protested Customs' classification of the merchandise within the time provided for by law. After having paid all liquidated duties due, plaintiff timely commenced this action.

B. *Relevant Tariff Provisions*

(1) Note 2 to Section XVI of the HTSUS provides in relevant part as follows:

Subject to note 1 to this section, note 1 to chapter 84 and to note 1 to chapter 85, parts of machines ... are to be classified according to the following rules:

(a) Parts which are goods included in any of the headings of chapters 84 and 85 ... are in all cases to be classified in their respective headings;

(b) Other parts, if suitable for use solely or principally with a particular kind of machine, or with a number of machines of the same heading ... are to be classified with the machines of that kind....

(2) Rule 1(c) of the Additional U.S. Rules of Interpretation of the HTSUS provides that

In the absence of special language or context which otherwise requires—

(c) a provision for parts of an article covers products solely or principally used as a part of such articles but a provision for "parts" or "parts and accessories" shall not prevail over a specific provision for such part or accessory;

...

C. *The Mitsubishi Case: Classification of Continuous Steel Casting Machine Parts Under the Tariff Schedule of the United States ("TSUS")*

The same parties before the Court in this case came before the Court in 1993 to settle

the issue of whether fifteen components of a continuous steel casting machine should be classified as parts of casting machines under 674.10, TSUS, or under separate TSUS provisions corresponding to the identity of each component. *See Mitsubishi,* 17 CIT 871, 829 F.Supp. 1387.

In *Mitsubishi,* Customs classified fifteen components of a continuous steel casting machine under several different TSUS items. At trial, plaintiff argued General Rule of Interpretation ("GIR") 10(ij)[2] required the imported components be classified under Item 674.10, TSUS, as "Converters, ingot molds, and casting machines, all the foregoing of types used in metallurgy and in metal foundries, and parts thereof". The Court held for the plaintiff based on its determination that under Rule 10(ij), the imported components were solely or chiefly used as parts of continuous casting machines and found as a matter of law that the TSUS did not contain any specific provisions for those components. *See id* at 889, 829 F.Supp. at 1400.

In the first step of its two-part inquiry, the Court considered whether the components at issue were used solely or chiefly as parts of a continuous casting machine, in accordance with GIR 10(ij)'s first clause which indicated "a provision for 'parts' of an article covers a product solely or chiefly used as a part of such article". The Court reasoned that in order to determine if a component was used solely or chiefly as a part, it must consider the "'nature, function and purpose [of the component] in relation to the article to which it is attached or designed to serve'" and consider whether the component was an integral component necessary for the completion of the article. *See id.* at 881, 829 F.Supp. at 1395 (quoting *Ideal Toy Corp. v. United States,* 58 C.C.P.A. 9, 13, 433 F.2d 801, C.A.D. 996 (1970)). The Court found each of the individual components contributed to the operation of the assembled casting machine

and each played an "essential and unique role in the casting machine's operation and in the overall casting process." *Id.* at 882, 829 F.Supp. at 1395. The Court also concluded the components were "dedicated for use" in the casting machine. *Id.* at 883, 829 F.Supp. at 1396.

The Court then turned to the second clause of GIR 10(ij) in order to determine whether the individual components were specifically provided for in the various TSUS items selected by Customs so as to preclude application of Item 674.10, TSUS, the provision advocated by plaintiffs. After reviewing the competing provisions, the Court concluded none of the items chosen by Customs more specifically provided for the components than Item 674.10, TSUS, the provision for parts of a casting machine. The Court's decision in *Mitsubishi* relied on two earlier decisions addressing the proper classification of parts.

First, in *Robert Bosch Corp. v. United States,* 63 Cust. Ct. 187, C.D. 3895, 305 F.Supp. 921 (1969), the Customs Court considered whether an automobile radio and radio antenna were properly classifiable as automobile parts or as radiotelegraphic and radiotelephonic transmission and reception apparatus and held the items at issue were classifiable by operation of GIR10(ij) as radiotelegraphic and radiotelephonic transmission and reception apparatus. The Court found another provision, the provision for radiotelegraphic and radiotelephonic transmission and reception apparatus, more specifically described the car radio and antenna than the provision for automobile parts and applied the second prong of GIR 10(ij). In reaching this holding, the *Bosch* Court emphasized its decision was consistent with GIR 10(ij)'s direction that a provision for "parts" of an article does not prevail over a specific provision for the part.

---

**2.** GIR 10(ij) provides that for the purposes of the TSUS

A provision for "parts" of an article covers a product solely or chiefly used as a part of such

article, but does not prevail over a specific provision for such part.

In applying *Bosch* to the case before it, the *Mitsubishi* court stated it interpreted *Bosch* to have concluded that the tariff provision for "radiotelegraphic and radiotelephonic transmission and reception apparatus" applied to the automobile radio and antenna at issue because the provision's terminology embraced all radio apparatus even though the tariff provision did not specifically identify car radio apparatus. The court continued to explain the term "generic" used in *Bosch* described how Item 685.22, TSUS, identified a class of specifically defined equipment, whereas the definition of "generic" advanced by the government in *Mitsubishi* was so allencompassing that it would render meaningless many tariff provisions, including the ones for parts of continuous casting machines.

The *Mitsubishi* court also based its holding on *United States v. DeLaval Separator Co.*, 65 C.C.P.A. 48, 569 F.2d 1134, C.A.D. 1204 (1978), a case which reviewed whether refrigerator tanks were classified properly under either the TSUS provision for refrigerator parts or the provision for "on-farm equipment for the handling or drying of agricultural or horticultural products." The *DeLaval* court held the handling equipment provision did not more specifically provide for the refrigerator parts for purposes of GIR 10(ij), because the handling provision was "sweeping in scope" and "encompass[ed] countless other products which find utility on a farm." *Id.* at 50, 569 F.2d at 1136.

In *Mitsubishi*, the court found the provision for lifting and handling equipment at issue in *DeLaval* was just as sweeping in scope as the provision before it, and held that Item 664.10, TSUS, did not specifically provide for any of the caster components originally classified under that Item. *See Mitsubishi*, 17 CIT at 885, 829 F.Supp. at 1397. The court instead ordered the components at issue classified as parts of castors under Item 674.10, TSUS, the provision for "[c]onverters, ingot molds, and casting machines, all the foregoing types used in metallurgy and in metal foundries, and parts thereof." *Id.* at 888, 829 F.Supp. at 1400.

## CONTENTIONS OF THE PARTIES

Plaintiff argues Customs erred in classifying the merchandise at issue under several different subheadings of the HTSUS and not as parts of a continuous steel casting machine under subheading 8454.90.00, HTSUS, free of duty. Plaintiff argues this Court previously held in *Mitsubishi* that under the TSUS, parts of continuous steel casting machines were classifiable under the provision for parts of a casting machine rather than under the provisions put forward by Customs. Plaintiff argues the *Mitsubishi* decision is applicable to the entries at issue in this case because the relevant tariff language did not change when the HTSUS replaced the TSUS. Plaintiff contends the components at issue are all parts necessary for continuous steel casting and are parts specifically designed for and solely used in a continuous steel casting machine. In addition, plaintiff argues the tariff provisions under which Customs classified the imported merchandise do not provide for the imported merchandise. As a result, plaintiff requests this Court order Customs to classify the merchandise at issue under subheading 8454.90.00, HTSUS, free of duty, as parts of casting machines.

Defendant argues plaintiff's contentions that the merchandise at issue should be classified as parts of casting machines under subheading 8454.90.00, HTSUS, free of duty, are unmeritorious. Defendant contends neither this Court's decision in *Mitsubishi* nor the TSUS are applicable in this action. Defendant maintains Congress recognized classification results under the new tariff schedule could be different from those under the TSUS and argues "prior TSUS cases may be *instructive*, but only when the language of the provision has not changed and the HTSUS does not require a different result." (Def.'s Mem. in Supp. of Cross Mot. for Summ. J. and in Resp. to Pl.'s Mot. for Summ. J. ("Def.'s Br.") at 7.)

## STANDARD OF REVIEW

■ In a case involving factual disputes between the parties, the government's classi-

fication decision is presumed to be correct, *see* 28 U.S.C. § 2639(a)(1) (1988 & Supp. V), and the party challenging the decision has the burden of overcoming the statutory presumption by a preponderance of the evidence. *See St. Paul Fire & Marine Ins. Co. v. United States*, 6 F.3d 763, 769 (Fed.Cir. 1993). Where, as here, there are no material facts in dispute and only questions of law remain, the statutory presumption of correctness under § 2639 is not applicable, and the Court has a statutory duty to decide independently the meaning of a classification term. No deference attaches to Customs' classification decisions where there are no disputed issues of material fact.

◼ In *Rollerblade, Inc. v. United States*, 112 F.3d 481, 484 (Fed.Cir.1997) the Court of Appeals for the Federal Circuit ("Federal Circuit") held the Court of International Trade's ("CIT") duty "to reach the correct decision" in classification cases would be subverted if Customs' interpretation of a classification term was given deference. *See also Universal Electronics v. United States*, 112 F.3d 488, 491–93 (Fed.Cir.1997). As a result, if the Court finds, because of evidence or other authority presented by plaintiff, that Customs' classification decision is incorrect, this Court must reach the correct classification on its own or after remand to the agency. *See Jarvis Clark Co. v. United States*, 2 Fed. Cir. (T) 70, 74–75, 733 F.2d 873, 878 ("[T]he court's duty is to find the *correct* result, by whatever procedure is best suited to the case at hand."), *petition for reh'g denied*, 2 Fed. Cir. (T) 97, 739 F.2d 628 (1984).

## DISCUSSION

### A. *Summary Judgment*

This case is before the Court on cross-motions for summary judgment. Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." U.S. CIT R. 56(d). "The Court will deny summary judgment if the parties present 'a dispute about a fact such that a reasonable trier of fact could return a verdict against the movant.'" *Ugg International, Inc. v. United States*, 17 CIT 79, 83, 813 F.Supp. 848, 852 (1993) (citation omitted). Both parties in this case agree that trial is inappropriate and that there are no genuine issues of material fact which would prevent this Court from deciding this action on the basis of the pending motions for summary judgment. (Pl.'s Mem. of Law in Supp. of Mot. for Summ. J. ("Pl.'s Br.") at 8; (Def.'s Br. at 4); (Def.'s Mem. in Reply to Pl.'s Opp'n to Def.'s Cross–Mot. for Summ. J.) ("Def.'s Reply") at 20.) Therefore, the sole issue remaining in this case is the proper interpretation of the pertinent sections of the HTSUS. *See Rollerblade, Inc.*, 112 F.3d at 483 ("[N]one of the pertinent characteristics of the merchandise is in dispute, and thus the sole issue is a matter of properly interpreting the classification term at issue ... to determine whether the scope of that term is broad enough to encompass the items with the particular characteristics.").

### B. *Application of Mitsubishi and the Change from the TSUS to the HTSUS*

Plaintiff argues "the imported components, because they are parts suitable for use solely or principally with a continuous steel casting machine, and because no other provision provides for the parts as discrete articles or goods, must be classified under heading 8454, HTSUS." (Pl.'s Br. at 27–28.) Plaintiff argues this Court already has held under the TSUS that parts of continuous steel casting machines are classifiable under the parts provision for casting machines rather than the alternative provisions put forward by Customs. Plaintiff compares the language of TSUS Item 674.10 ("Converters, ingot molds, and casting machines, all the foregoing types used in metallurgy and in metal foundries, and parts thereof ..."), the basis for the Court's decision in *Mitsubishi*, to the language of HTSUS subheading 8454.90.00 ("Converters, ladles, ingot molds and casting

machines, of a kind used in matellurgy or in metal foundries, and parts thereof: Parts . . . Of casting machines") and concludes the comparison "clearly shows that no substantial change to the provision covering continuous casting machines and parts thereof was made when the HTSUS was adopted." (Pl.'s Br. at 16.) Plaintiff concludes

> the similarity between the language used in the HTSUS and that found in the TSUS supports the same conclusion in this case as the court held in the first. The legislature is presumed to have approved the judicial construction of a tariff provision when the provision is reenacted in the same or substantially the same language.

(*Id.* at 19 (citation omitted).)

Defendant contends neither *Mitsubishi* nor the TSUS are applicable in this action. Defendant argues Congress recognized classification results under the new tariff schedule could be different from those under the TSUS and argues "prior TSUS cases may be *instructive,* but only when the language of the provision has not changed and the HTSUS does not require a different result." (Def.'s Br. at 7.) Defendant explains *Mitsubishi* was decided according to the Court's interpretation of GIR 10(ij) of the TSUS which required a relative specificity analysis to determine whether the subheadings proffered by Commerce specifically provided for the merchandise at issue. Defendant maintains under the HTSUS, however, this relative specificity analysis is not required.

Defendant additionally contends Additional Rule of Interpretation 1(c), HTSUS, while similar to GIR 10(ij), is prefaced with a clause the TSUS did not contain, stating it applies only "[i]n the absence of special language or context which otherwise requires." (*Id.* at 8 (quoting Additional Rule of Interpretation 1(c)) (emphasis added in Def.'s Br.).) Defendant explains Additional Rule of Interpretation 1(c) also states in the absence of additional language, a provision for parts covers articles solely or principally used as parts, but will not prevail over a specific provision for such part. Defendant concludes "[t]he language clearly demonstrates Congress intended that Additional Rule 1(c) be narrowly applied only where other context does not require. Here, 'special language or context . . . otherwise requires.'" (*Id.* at 9.)

Defendant argues plaintiff "forgets that in certain circumstances, the HTSUS was expressly intended to modify the treatment of certain merchandise" and "classification results under the new tariff could be different from those under the TSUS." (Def.'s Reply at 8.) Defendant maintains "it is long settled that a change in the language of a statute is generally construed to import a change in meaning unless the contrary is made plainly to appear in other ways." (*Id.* (citation omitted).) In this case, defendant explains, the addition of Note 2(a) to Section XVI of the HTSUS, which requires "[p]arts which are goods included in any of the headings of chapters 84 and 85 . . . are in all cases to be classified in their respective headings", "shows that Congress intended a change in the tariff treatment of merchandise such as Mitsubishi's, so that the merchandise is classified within its own heading, and not as part of a casting machine." (*Id.* at 9 (footnote omitted).) Defendant further argues the rate increase on plaintiff's merchandise may have been critical and notes the legislative history included a statement that

> any changes in the rates of duty are consequential to the process of converting to the new nomenclature, and are necessary to reflect an overall balance of tariff concession commitments between the United States and its trading partners in the GATT. Some of the rate increases in the United States' conversion respond to our trading partners' failure to make appropriate commitments in the GATT negotiations on the Harmonized System.

(*Id.* at 8 (quoting H.R. Conf. Rep. No. 100–576, at 88 (1988)), 1988 U.S.C.C.A.N. 1547.)

In further discussing the importance of Note 2(a) to Section XVI of the HTSUS, defendant contends "Mitsubishi again attempts to sidestep the transparency of the statute in its opposition by ignoring Note 2(a)

to Section XVI of the HTSUS which modifies the application of [Additional U.S. Rule of Interpretation] 1(c) here" which applies only " 'in the absence of special language or context which otherwise requires.' " (*Id.* at 3 (footnote omitted).) Defendant explains Note 2(a) provides "[p]arts which are goods included in any of the headings of chapters 84 and 85 ... are in all cases to be classified in their respective headings" and concludes as all of the merchandise at issue, except the segment stand test, are goods properly classified within chapters 84 and 85, HTSUS, the merchandise at issue is classified correctly within the appropriate subheadings, as found by Customs. Defendant states "[t]he plain language of the HTSUS provides, therefore, that Note 2(a) is to be broadly applied and goods covered by *any* Heading in chapter 84 or 85 are *always* classified in those Headings," (Def.'s Br. at 9), and argues "[b]y its very language, Note 2(a) is 'special language or context which otherwise requires'; and therefore modifies the effect of Rule 1(c) in this case." (Def.'s Reply at 3.) Defendant argues "[t]he fact that Rule 1(c) is an 'additional' note and applies 'in the absence of special language or context which otherwise requires' plainly indicates that Congress intended the Additional U.S. Rule to be subordinate to the rest of the legal language of the HTSUS." (*Id.* at 5.) Defendant additionally contends plaintiff's position that Additional U.S. Rule of Interpretation 1(c) was designed to clarify Note 2(a) to Section XVI of the HTSUS is not supported by case law or by the HTSUS.

Defendant argues plaintiff incorrectly contends the Court should interpret Note 2(a) to Section XVI to require that only goods "more specifically" covered by chapters 84 and 85 should be classified within those headings and concludes "Note 2(a) does not limit classification to cases whether goods are 'specifically,' or even 'more specifically' provided for in heading 84 or 85" but "explicitly provides that articles included within *'any '* chapter 84 or 85 headings are *'always '* classified within those headings." (*Id.* at 5.) Defendant argues the merchandise at issue is clearly clas-

sifiable within headings in chapter 84 or 85, HTSUS.

In further support of its position, defendant quotes the Explanatory Notes for Note 2 of Section XVI. The Explanatory Notes provide:

> The above rules [that parts which are suitable for use solely or principally with particular machines are classified in the same Headings as the machines] do *not* apply to parts which in themselves constitute an article covered by a Heading of this Section (*other than* Headings 84.85 and 85.84); these are *in all cases* classified in their own appropriate Heading *even if specially designed to work as part of a specific machine.* This applies in particular to:
>
> ...
>
> (3) Lifting and Handling machinery (Heading 84.25, 84.26 or 84.28)

(Def.'s Br. at 10 (quoting *Harmonized Commodity Description and Coding System, Explanatory Notes*, at 1131 (second and third emphasis added by defendant)).) Defendant additionally quotes the Explanatory Notes to Heading 84.28 which provide:

> It should, however, be noted that the Heading *excludes* lifting or handling machines designed to be incorporated in furnaces, coverters, etc., or to form a complete unit therewith, *provided* they are presented with the furnaces, etc. (see *Headings 84.17, 84.54, 84.44,* etc.). *When presented separately they remain in this Heading* [Heading 8428].

(*Id.* at 10–11 (quoting Harmonized *Commodity Description and Coding System, Explanatory Notes*, at 1200 (fourth emphasis added by defendant)).) Defendant argues plaintiff's claim *Mitsubishi* provides relevant and applicable precedent in this matter must fail because "the HTSUS contains Note 2(a), a provision whose very language absolutely contradicts Mitsubishi's contentions and which *did not appear in the TSUS in any form whatsoever.*" (Def.'s Reply at 4.)

Finally, the government responds to plaintiff's argument that defendant's interpreta-

tion of Note 2(a) to Section XVI of the HTSUS would render numerous tariff provisions addressing "parts" meaningless because nothing would be classified as "parts" by stating merchandise with the primary purpose of casting has been classified consistently as parts under Heading 8454, HTSUS. Defendant argues plaintiff inaccurately asserts the primary purpose of all of the components at issue is casting and, therefore, all of its merchandise must be classified as parts of casting machines. Defendant contends Mitsubishi's own evidence demonstrates the primary purpose of many of the articles at issue is not the creation of steel slabs, but consists of other operations, and therefore, the merchandise at issue cannot be classified as parts of casting machines under Heading 8454, HTSUS.[3]

Plaintiff disagrees with defendant's construction of Note 2(a) to Section XVI and argues it does not function independently of HTSUS General Rule of Interpretation ("GRI") 1, but must be read *in pari materia* with Additional U.S. Rule of Interpretation 1(c). Plaintiff argues Additional Rule of Interpretation 1(c) was modeled after GIR 10(ij), TSUS, and contends "in order for a part to be found a 'good' in chapter 84 or 85 and classified there pursuant to Section Note 2(a), the provision for the 'good' must describe the part in a manner supported by GRI 1 and the other rules of tariff construction, including the common law." (Pl.'s Br. at 21.) Plaintiff contends the imported components at issue here are not "goods included in any of the headings of chapter 84 or 85" (*Id.* at 23 (internal quotes omitted).) Plaintiff also maintains "[t]he addition of Rule 1(c)

shows that the concept of specificity and the spirit of GIR 10(ij) were to be included in the HTSUS, and to be read in conjunction with its provisions," (*id.* at 24), and additionally argues Additional U.S. Rule of Interpretation 1(c) "was added into the United States tariff [schedule] to clarify and make consistent the treatment of parts, and explicitly to require a 'specific provision' in light of the International Nomenclature Committee to the Convention on the Harmonized Commodity and Coding System's vague language regarding the scope of Note 2(a)." (Pl.'s Mem. of Law in Opp'n to Def.'s Cross–Mot. for Summ. J. and in Supp. of Pl.'s Mot. for Summ. J. ("Pl.'s Opp'n") at 13.) Plaintiff argues to accept defendant's interpretation would mean "virtually any mechanized device that can lift, handle or load, regardless of the other functions it performs or the other features in [sic] incorporates" would be improperly excluded from classification under Heading 8454, HTSUS. (Pl.'s Br. at 25.) Plaintiff instead maintains "[Additional U.S.] Rule 1(c) clarifies and defines what is meant by 'goods included in the headings' by requiring, under United States law, that classification of a part be under a specific provision for that part, and if not, then under the parts provision." (*Id.* at 26.)

Plaintiff further notes it acknowledges that unlike GIR 10(ij), Note 2(a) to Section XVI does not employ the clause "specific provision for such part", but argues "this is not a point of distinction because courts always construed Rule 10(ij)'s specificity requirement liberally to include tariff provisions that described an article by name, specific function or generic term.[4] Those courts drew the line

---

**3.** Defendant gives several examples to support its argument. For example, defendant argues the tundish nozzle preheat station is described in an affidavit submitted by plaintiff as a gas heater and its sole function is to heat the tundish nozzle to help maintain the tundish nozzle in good working order. (*See* Def.'s Reply at 10 (citing Aff. of Tadashi Umeda ¶ 33).) Defendant also points out the mold and first zone lifting beam has been described as a "special lifting tool," which allows for the removal and replacement of the slab making components for repairs. (*See id.* (citing Aff. Of Tadashi Umeda at ¶ 40).) Finally, defendant maintains the roller tables are " 'used

to hold and convey the solidifying slab during the final forming operations,' " from the point where it leaves the segments to the areas where the cutting and deburring operations are performed. (*See id.* (citing Aff. Of Tadashi Umeda at ¶ 76).) Defendant concludes the heating, lifting and conveying functions are the sole functions performed by these articles.

**4.** Rule 10(ij) states a part is classified under a provision for "parts" unless a "specific provision" for that part exists, in which case it is classified under the specific provision.

at general, catch-all basket provisions, and refused to classify parts in those provisions pursuant to Rule 10(ij)." (Pl.'s Opp'n at 11–12 (citation omitted).) Plaintiff contends although Section Note 2(a) does not include a specificity clause,

> common sense and traditional Customs jurisprudence regarding the classification of parts support Plaintiff's position that Note 2(a)'s reference to "parts which are goods included in any of the headings of chapters 84 and 85 . . ." means a heading that provides for the part in an express manner that is not a broad,"catch-all basket provision."

(*Id.* at 12.)

Defendant contests plaintiff's argument that Section Note 2(a) must be read *in pari materia* with GRI 1 and argues it is unmeritorious. Defendant argues plaintiff "misunderstands both GRI 1 and its relation to Note 2(a), as well as the reasons its merchandise is properly classified in Heading 84." (Def.'s Br. at 12.) Defendant explains even if plaintiff is correct that Note 2(a) must be read *in pari materia* with GRI 1, "nothing within the HTSUS (much less explicitly GRI 1 or Note 2(a)) supports Mitsubishi's jump in logic that Note 2(a) therefore applies only to Headings which narrowly name specific products." (*Id.*) Defendant observes GRI 1 expressly dictates classification is governed by the section and chapter notes, and concludes pursuant to the plain language of the HTSUS, all components which are classifiable under chapters 84 and 85, HTSUS, must be classified within the relevant and applicable headings and not as parts of casting machines under Heading 8454, HTSUS.

This Court finds plaintiff's argument the *Mitsubishi* decision is determinative of this case is based on a misreading of *Mitsubishi* and of the differences between the relevant provisions of the HTSUS and the TSUS. The *Mitsubishi* Court did not find, as plaintiff claims, that similar merchandise was excluded from classification within the lifting and handling provisions of the TSUS. Rather, the Court held for the plaintiff based on

its determination that under Rule 10(ij), the imported components were solely or chiefly used as parts of continuous casting machines and found as a matter of law that the TSUS did not contain any specific provisions for those components. *See Mitsubishi,* 17 CIT at 889, 829 F.Supp. at 1400. This Court finds persuasive defendant's argument the addition of Section Note 2(a) and its effect on the outcome of this case cannot be ignored nor explained simply as a clarification of Additional U.S. Rule 1(c), as plaintiff argues. As a result of the changes in language between the TSUS and the HTSUS, this Court holds it cannot apply the holding of *Mitsubishi* to the facts of this case. While several of the components at issue here may be similar to those at issue in *Mitsubishi,* and while Additional U.S. Rule 1(c) is similar to GIR 10(ij), Rule 1(c) contains the proviso that it applies "[i]n the absence of special language or context which otherwise requires." The inclusion of Note 2(a) to Section XVI provides a "context" which requires this Court to examine whether the components at issue are "[p]arts which are goods included in any of the headings of chapters 84 and 85" and thus whether they should "be classified in their respective headings."

The Court now turns to the issue of whether the merchandise at issue falls was classified properly by Customs, in effect, whether the components at issue are "goods included in any of the headings of chapters 84 and 85."

### C. *Whether Customs Properly Classified the Merchandise at Issue*

■ Classification of merchandise under the HTSUS is performed in accordance with the General Rules of Interpretation, taken in order. GRI 1 states "classification shall be determined according to the terms of the headings and any relative section or chapter notes." HTSUS, GRI 1. In the absence of a precise definition appearing in the HTSUS, the correct meaning of a tariff term is usually resolved by ascertaining its common and popular meaning. In construing such terms, "the court may rely upon its own understanding, dictionaries and other reliable sources."

*Medline Industries, Inc. v. United States*, 62 F.3d 1407,1409 (Fed.Cir.1995) (*citing Marubeni Am. Corp. v. United States*, 35 F.3d 530 (Fed.Cir.1994)). Once the correct meaning of the terms within the provision are ascertained, a determination must be made as to whether the merchandise at issue falls within the description of such terms as properly construed. *See National Advanced Systems v. United States*, 26 F.3d 1107, 1109 (Fed.Cir. 1994).

Defendant argues. the merchandise at issue, with the exception of the segment test stand, was clearly and properly classifiable as liquidated by Customs because all of the articles imported by plaintiff are described by specific headings within chapters 84 and 85, and therefore, in accordance with Note 2(a) to Section XVI, are classified properly under these headings rather than under Heading 8454. Plaintiff responds by arguing that assuming *arguendo* the Court does not follow the reasoning set out in *Mitsubishi*, the provisions under which Customs classified the imported components do not provide for the components.

Plaintiff maintains the imported components are "not described by the tariff provisions under which Customs' [sic] classified them" and "[b]ecause the imported components are not provided for in heading 84 or 85[sic] (other than as parts of a casting machine), classification according to Section XVI, Note 2(a) fails." (Pl.'s Opp'n at 15.) Plaintiff argues, therefore, "Note 2(b) [of Section XVI] controls, and the imported components must be classified as parts of the machine for which they are solely and principally used: a continuous steel casting machine." (*Id.*) Plaintiff also contends application of the "more than" doctrine, where an article that is "more than" a certain other article is not described by the provision for the article, establishes that "the imported merchandise cannot be classified under the provisions chosen by Customs." (Pl.'s Br at 31.) Plaintiff argues

> [i]n some cases, the provisions are so general that they cover a myriad of products under a literal construction of the statute. In others, the provisions chosen by Cus-

toms are simply wrong as a matter of law. In addition, because of the special and unique design features that dedicate the components for use as components of a continuous steel casting machine, they are "more than" or "other than" the general types of articles classified in the provisions in which Customs classified the merchandise. Therefore, because these components are "suitable for use solely or principally" as a continuous steel casting machine, and are not "goods included in any of the headings of chapter 84 or 85 ...", Note 2 to Section XVI requires classification under heading 8454.

(*Id.* at 48–9.)

Defendant responds to plaintiff's argument regarding the application of the "more than" doctrine by asserting "the judicially developed 'more than' or, more correctly, 'other than' doctrine has been subsumed into the General Rules of Interpretation ('GRI's') under the HTSUS." (Def.'s Reply at 11–12.) Defendant continues to explain

> the GRI's specify that when classifying an article that consists of more than one material or substance, rather than using a "more than" or "other than" analysis, the GRI's require a step by step consideration of each succeeding principle of classification: relative specificity (GRI 3(a)), essential character (GRI 3(b)), and finally, last in numerical order (GRI 3(c)).

(*Id.* at 12–13.) Defendant concludes even if the "more than" or "other than" doctrine exists independent of the HTSUS, "Mitsubishi cannot point to any feature or element of the merchandise *as imported* which would make them 'more than' the Government's provisions." (*Id.*) The Court now turns to an examination of each heading under which the components were classified to determine if Customs correctly classified the merchandise at issue.

A. *Heading 8428, HTSUS "Other lifting, handling, loading or unloading machinery (for example, elevators, escalators, conveyors, teleferics)."*

Customs classified the ladle turret, tundish transfer car, ladle-to-tundish shroud chang-

ing mechanism, tundish lifting beam, segment changer system (stationary guide), segment lifting beam, mold and first zone lifting beam, segment transfer car, slab transfer table, torch approach table, torch roller table and torch runout table under Heading 8428, HTSUS.

■ Plaintiff argues Heading 8428, HTSUS, does not provide for the imported merchandise "even in a broad or literal reading," (Pl.'s Br. at 32–33), and asserts the terms listed in the heading "do not describe any of the items presently at issue," (*id.* at 33), because "[t]he provisions under which Customs classified Plaintiff's merchandise are catch-all 'other' provisions, with 8428.39 covering merchandise that meets the description of 'Other ... conveyors, for goods or materials: Other', and 8428.90 covering merchandise describable as 'Other lifting, handling ... Other machinery.'" (*Id.* at 32 (emphasis omitted).) Plaintiff also contends the subheadings chosen by Customs are not *eo nomine* provisions describing merchandise by a specific name, nor are they use provisions.[5]

In support of its argument, plaintiff maintains the common and commercial meaning of the terms within Heading 8428, HTSUS, and its coverage of "[o]ther lifting [and] handling" components cannot be construed to describe the imported merchandise at issue because the definition of lifting and handling machinery found in the Explanatory Notes refers to machines " 'usually based on pulley,

winch or jacking systems, and [which] often includ[e] large proportions of static structural steelwork, etc.'" (Pl.'s Br. at 33 (quoting Harmonized Commodity Description and Coding System: Explanatory Notes 1197 (1986)).) Plaintiff also argues "[m]aterial handling machines, including conveyors, are used to move discrete finished products or precursor raw materials, whereas the imported components are parts of the machine that converts the raw material (molten steel) into the finished product (steel slabs of a particular size)." (Pl.'s Opp'n at 16.) Plaintiff cites the *Academic Press Dictionary of Science and Technology,*[6] as well as *McGraw–Hill Concise Encyclopedia of Science and Technology*[7] to support its argument that lifting or handling equipment is not synonymous with machinery used to manufacture steel. Plaintiff concludes the imported components at issue "do not lift or handle a finished product, but instead are operating in conjunction with other components to manufacture the finished product." (Pl.'s Br. at 34.)

Defendant argues "the subheadings of Heading 8428 and the Explanatory Notes explicitly cover [the] merchandise at issue." (Def.'s Br. at 15.) Defendant contends articles classified within heading 8428, HTSUS, "need not always be based upon a pulley, winch or jack system" and "[t]he Notes also specify that 'this Heading covers a *wide range of machinery* for the mechanical handling of materials, goods, etc. (lifting, coveying, loading, unloading, etc.).'" (*Id.* at 16 (quoting Harmonized Commodity Description

**5.** A "use provision" classifies an article by its use, whereas an *eo nomine* provision describes merchandise by a specific name, usually one well-known in the trade, which includes all forms of the article as if each were provided for by name in the tariff provisions. Defendant responds to plaintiff's argument by maintaining the issue of whether a subheading is a "catch-all" heading, or *eo nomine* or use, is irrelevant in determining whether merchandise actually fits within a particular provision. (*See* Def.'s Br. at 15.) Defendant further contends plaintiff misunderstands that the issue is not which provision is most "specific" but, rather, simply whether the provision under which the merchandise is classified covers the article. (*See id.*)

**6.** The term "materials handling" is defined as " 'the process through which raw materials and manufactured goods are transported, positioned and stored for industrial and commercial operations.'" (Pl.'s Br. at 33 (quoting *Academic Press Dictionary of Science and Technology* 1324 (1992)).)

**7.** The term "material handling equipment" is defined as " '[d]evices used for handling materials in an industrial distribution activity. The equipment moves products as discrete articles, in suitable containers, or as solid bulk materials which are relatively free-flowing.'" (Pl.'s Br. at 33–34 (quoting *McGraw–Hill Concise Encyclopedia of Science and Technology* 1127 (2d ed.1989)).)

and Coding System, Explanatory Notes)) (emphasis added by defendant). Defendant argues "Mitsubishi misunderstands that while the [sic] much of the merchandise at issue here may be eventually utilized in the process of casting steel, its immediate *primary* function design, construction, or function is not making steel slabs. Rather, it is lifting and handling materials." (Def.'s Reply at 14 (citation omitted)). Defendant adds "because the Explanatory Notes also state that Heading 8428 covers machinery for the 'mechanical handling of materials, good, *etc,*' Mitsubishi's assertions that Heading 8428 only describes machines that handle materials, and Mitsubishi's reliance upon only definitions of the term 'material' are misplaced." (Def.'s Br. at 17.) Defendant concludes "Mitsubishi's narrow definition of lifting and handling machinery is not supported by the HTSUS" because the definition "includes a wide range of machinery for mechanical handling of materials, goods, people, and other items." (*Id.* at 18.)

1. *Subheading 8428.39, HTSUS: Torch Approach Table, Torch Roller Table, Torch Runout Table, Slab Transfer Table*

Customs classified the torch table, torch roller table, torch runout table, and slab transfer table under subheading 8428.39, HTSUS, as "Other lifting, handling, loading or unloading machinery: ... Other continuous-action elevators and conveyors, for goods or materials: Other", dutiable at 2% *ad valorem.* The tables are used to convey the solidifying steel slab during the final forming operations. Each roller table consists of a frame onto which rollers with bearings and drives are mounted and they advance and discharge the slab at a casting speed synchronized with the speed of the torch cutter

or in accordance with a certain time cycle of a subsequent process, such as deburring or weighing. The frames are connected and mounted on a common foundation. (*See* Pl.'s Facts at 10–11; Def.'s Resp. at 10.)

Plaintiff argues the common and commercial meaning of Heading 8428.39, HTSUS, cannot be construed to describe the imported merchandise. Plaintiff contends the roller tables are not used to convey a finished slab, but are part of the machinery used to form and contain the steel slabs. Plaintiff maintains the components are not conveyors "as that term is commonly and commercial [sic] known or described in the [Explanatory Notes]" because they do not move or handle materials or finished products but are instead individual frames and roll assemblies with bearings and drives onto which the roll assemblies are mounted after importation. (Pl.'s Br. at 39.) After entry, plaintiff explains, "[the components] are not discrete 'conveyors' capable of being used as a roller conveyor system to move materials or products", but the frames are connected and mounted on a common foundation with the other components of the casting machine, and the roll assemblies are affixed onto the frames, becoming part of the casting machine's flow line. (Pl.'s Opp'n at 18.) Plaintiff maintains the roller tables "are used to support the cooling slabs between the containment area and that part of the continuous casting process where the slab is cut to size, deburred and weighed" and are not part of a conveyor. (Pl.'s Br. at 39.) Plaintiff concludes the definitions of conveyors found in the *McGraw Hill Dictionary of Scientific and Technical Terms* [8] and the Explanatory Notes "show that devices known as conveyors are a distinct type of machine used to move and distribute discrete finished products or precursor raw materials. They are

---

8. A "conveyor" is defined by the *McGraw Hill Dictionary of Scientific and Technical Terms* as " '[a]ny materials-handling machine designed to move individual vehicles such as solids or free flowing bulk materials over a horizontal, inclined, declined, or vertical path of travel with continuous motion.' " (Pl.'s Br. at 39 (quoting *McGraw Hill Dictionary of Scientific and Techni-*

*cal Terms* 364 (3d ed.1984)).) The Explanatory Notes provide examples of conveyors operated by continuously moving, carrying or pushing elements, conveyors consisting of a train of motor-driven or not power-driven rollers, and a vibrator or shaker conveyor. *See* Harmonized Commodity Description and Coding System: Explanatory Notes 1198–99 (1986).

not machines used in the actual process of manufacturing the product." *(Id.)*

Defendant notes "Section (II)(B)(2) of the Explanatory Notes for Heading 8428 provides that as used in Heading 8428, '*Conveyors* are used for moving goods, usually in a horizontal direction'" and concludes "[t]he tables at issue here clearly are used for moving goods in a horizontal direction, and are consequently conveyors, classifiable under 8428.39.00, HTSUS." (Def.'s Br. at 22.) Defendant further contends the Explanatory Notes do not limit the term conveyors to material handling machines which only move these narrow products and cites Subsection II of the Explanatory Notes to Heading 8428, HTSUS, as expressly including steel as a material handled by conveyors. Defendant additionally maintains contrary to any suggestion by plaintiff, the articles are not excluded from classification as conveyors based on speed. Defendant finally argues

> Mitsubishi's claim is incorrect that the merchandise is not properly classified as conveyors because the torch roller table holds a torch which cuts the steel slab into shorter lengths and the deburring table holds deburring machines which remove the burrs from each end of the steel slab after it has been cut. These additional machines are not imported with the tables, but are added after importation. Therefore, in the condition as imported the roller tables are merely conveyors, properly classifiable under 8428.39.00, HTSUS.

*(Id.* at 23–24.)

 This Court finds although the roller tables are used in the continuous steel casting process, plaintiff itself describes the tables' function as advancing and discharging the slab and further states they "are used to hold and convey the solidifying slab during the final forming operations." (Pl.'s Facts at 10.) The Court also notes defendant's argument the Explanatory Notes indicate heading 8428, HTSUS, covers a "wide range of ma-

chinery for the mechanical handling of materials, [and] goods" (Def.'s Br. at 16 (emphasis omitted)), and agrees the primary function of the components at issue is not making steel slabs but lifting and handling materials. The Court holds because the roller tables are within Section Note 2(a)'s provision covering "parts which are goods included in any of the headings of chapters 84 and 85", Customs properly classified the torch table, torch roller table, torch runout table, and slab transfer table, according to Section Note 2(a)'s mandate, under subheading 8428.39.00, HTSUS, as "Other lifting, handling, loading or unloading machinery: ... Other continuous-action elevators and conveyors, for goods or materials: Other", dutiable at 2% *ad valorem.*

### 2. *Subheading 8428.39.00, HTSUS: Deburring Table*

Customs classified the deburring table under subheading 8460.90.00, HTSUS, as "Machine tools for deburring, sharpening, grinding, housing, lapping, polishing or otherwise finishing metal, sintered metal carbides or cermets by means of grinding stones, abrasives or polishing products, other than gear cutting, gear grinding or gear finishing machines of heading 8461: Other:", dutiable at 4.4% *ad valorem.*[9]

Defendant indicates Customs' original classification of the deburring table under 8460.90.00, HTSUS, was based upon a misunderstanding that the article was in fact a deburring machine. Defendant continues to explain "[i]n its condition as imported, the article is only a roller table" and "[t]he deburring machine is not installed until after importation." (Def.'s Br. at 22 n. 11.) Defendant concludes "the imported article is a conveyor, classifiable under subheading 8428.39, HTSUS, at a duty rate of 2% *ad valorem.*" *(Id.)*

Plaintiff disagrees and argues the deburring table "is nothing more than a roller table, upon which a deburring device is add-

---

9. Plaintiff refers to this item as the deburring runout table while defendant argues there is no reference to a "deburring runout table" in any of the entries and refers to this item as the deburring table. The Court will refer to this item as the deburring table.

ed after importation." (Pl.'s Br. at 44.) Plaintiff additionally argues the table "is the same class of component that Customs classified under heading 8428, but which Plaintiff argues is classifiable under heading 8454." (*Id.*)

■ This Court finds the deburring table is properly classified as a conveyor, as defendant argues, under subheading 8428.39.00, HTSUS, at a duty rate of 2% *ad valorem*. Plaintiff concedes "the deburring runout table is similar to the [other roller tables]," and in further support of the Court's decision the deburring table should be classified as a conveyor, plaintiff explains after the deburring table, "[n]ext the slab is conveyed onto the weighing tables." (Pl.'s Facts at 12.) This Court finds this entry was properly classified as a conveyor under subheading 8428.39.00, HTSUS, instead of as part of a casting machine under Heading 8454, HTSUS.

3. *Subheading 8428.90, HTSUS: Segment Changer System, Ladle Turret, Tundish Transfer Car, Ladle–to–Tundish Shroud Changing Mechanism, Tundish Lifting Beam, Segment Lifting Beam, Mold and First Zone Lifting Beam and the Segment Transfer Car*

Customs classified the segment changer system, ladle turret, tundish transfer car, ladle-to-tundish shroud changing mechanism, segment transfer car, tundish lifting beam, mold and first zone lifting beam and segment lifting beam under subheading 8428.90, HTSUS, as "Other lifting, handling, loading or unloading machinery: . . . Other machinery:", dutiable at 2% *ad valorem*.

(a) Ladle Turret

The ladle turret is the component of the casting machine that rotates the ladle in and out of the casting position. It is a large electromechanical device that is motor driven and contains bearings, rolls, and frame and drive elements, such as gear boxes, gears and electric motors. (*See* Pl.'s Facts at 3; Def.'s Resp. at 2–3.)

Plaintiff argues the ladle turret does not lift or handle a finished product but "is the component of the casting machine that orients the ladle of molten steel into the casting commencement position" and then monitors and regulates the flow of the liquid steel into the tundish. (Pl.'s Br. at 34 (footnote and citation omitted).) Plaintiff argues the "special functions imparted by the ladle turret are central to the process of actually casting steel slabs in a continuous manner, and cannot be considered simple moving or handling features used to move a finished product from one place to another." (*Id.* at 35.)

Defendant argues, pursuant to *Mitsubishi*, the function of the ladle turret is to hold and rotate the ladle in and out of the casting position. Defendant quotes plaintiff's description of the ladle turret as consisting of

[a] very large diameter antifriction bearing . . . used to rotate the turret. The turret is rotated by means of a pinion and a large diameter pin-rack system. Emergency drive system for ladle rotation is provided using an air motor. The ladle is stopped precisely at a predetermined position using a brake and a specially designed position fixer.

(Def.'s Br. at 18 (quoting App. to Pl.'s Br., Ex. A at 3).) Defendant concludes "it is clear that the ladle turret's central, primary purpose is to handle and manipulate the ladle" and that "the ladle turret does not orient the ladle nor regulate the control of the flow of steel." (*Id.* at 18, 19.) [10] Defendant thus concludes the ladle turret "is therefore plainly classifiable under 8428.90, HTSUS." (*Id.* at 18.) Finally, defendant adds plaintiff's proof of the ladle turret's additional functions comes only from testimony proved in the

---

10. Defendant argues the ladle turret does not orient the ladle but stops at a predetermined position and merely rotates from one fixed position to another, which involves no orientation. (*See* Def.'s Br. at 19.) Defendant also disagrees with plaintiff's position that the ladle turret controls the flow of molten steel and argues these functions are performed by a human and not a machine. (*See id.*)

trial in *Mitsubishi*, and since plaintiff failed to provide proof that the ladle turret in both actions were the same, "Mitsubishi cannot substitute the facts in the earlier *Mitsubishi* case for the facts in the present action. Mitsubishi therefore failed to prove that the ladle turret is more than lifting and handling machinery, and Customs' classification must be sustained." (Def.'s Reply at 15.)

■ This Court finds Customs properly classified the ladle turret under subheading 8428.90, HTSUS, as "Other lifting, handling, loading or unloading machinery: ... Other machinery:", dutiable at 2% *ad valorem.* Plaintiff's description of the ladle turret as "the component of the casting machine that lifts and orients the ladle of molten steel," (Pl.'s Facts at 3), supports this Court's conclusion that the ladle turret's primary function is lifting or handling materials.

(b) Tundish Transfer Car and Ladle–to–Tundish Shroud Changing Mechanism

During the continuous casting process, the molten steel is poured from the ladle into the tundish, which is a rectangular, refractory-lined, fabricated steel vessel positioned above the mold, with nozzles along the bottom. The tundish is used to hold the molten steel bath during its distribution into the casting machine's mold. The depth and capacity of the tundish helps control the flow rate of the molten steel into the mold, minimizes temperature drops, facilitates the continuous casting process by allowing the empty ladle to be exchanged for a full one without interrupting the flow to the mold, and provides a reservoir for the flotation and removal of nonmetallic inclusions. (*See* Pl.'s Facts at 3; Def.'s Resp. at 3.)

The tundish transfer car supports and holds the tundish. It sits on a rail and moves between the casting position and an area away from the casting where the tundish shroud changing mechanism is removed. (*See* Pl.'s Facts at 4; Def.'s Resp. at 3.)

Plaintiff maintains "the tundish transfer car regulates the flow of the molten bath by making sure the liquid steel is driven through the bottom of the tundish at a certain speed and volume," a critical step in the steel casting process. (Pl.'s Br. at 35.) Plaintiff contends this, as well as the car's other functions of supporting argon gas load cells and being equipped with a limit switch bracket, are not handling features but features that "go to casting steel." (*Id.* at 36.)

The ladle-to-tundish shroud changing mechanism [11] is a device attached to the tundish transfer car that positions and supports the nozzle from the ladle in the tundish during the pour. (*See* Pl.'s Facts at 4.) The ladle-to-tundish shroud also prevents unwanted oxygen or nitrogen from entering the liquid metal stream during the transfer. (*See* Pl.'s Facts at 5; Def.'s Resp. at 4.)

Plaintiff explains the ladle-to-tundish shroud changing mechanism, in addition to positioning and supporting the nozzle, is used to detach, remove and replace the nozzle leading from the ladle into the tundish. Plaintiff concludes the tundish transfer car, along with the shroud changing mechanism "are integral to the manufacturing process," are "part of the flow line of the steel making process," and are not "based on a pulley, winch or jacking system." (*Id.*) Plaintiff also asserts "to describe [the components] as handling equipment is a gross oversimplification of what the components do in the operation of the caster and the manufacture of steel. As such, these components are 'more than' handling machines." (*Id.*)

Defendant contends in light of the fact that the tundish transfer car moves the tundish back and forth between the casting position and the "tundish yard" where tundishes are exchanged, "it is clear that the car is properly classified as lifting and handling machinery under Heading 8428." (Def.'s Br. at 20.) Defendant maintains the additional casting operations plaintiff claims are performed by

11. In response to plaintiff's description, defendant maintains at the time of importation, the tundish shroud changing mechanism is not part of the tundish transfer car. (*See* Def.'s Resp. at 3.)

the tundish transfer car, such as regulating the flow of the molten steel, are performed by other components, such as the ladle-to-tundish shroud changing mechanism and slide gate, that are "added to the tundish car *after* importation" and "[i]t is, of course, black letter law that an article is classified according to its condition upon importation." (*Id.* at 20 n. 8.) Defendant argues

> [i]f, at the time of importation, these parts were attached to the tundish transfer car, then the tundish transfer car would be a composite machine and would be classified according to Note 3 of Section XVI, HTSUS. . . .

> Here, however, no evidence shows that the additional parts were already attached to the tundish transfer car at the time of importation. Thus, in its condition as imported, the tundish transfer car can simply move the tundish back and forth, and is therefore is [sic] only a handling machine, classifiable under 8428.90, HTSUS.

(*Id.* at 20.) Defendant responds by asserting Mr. Umeda's affidavit, which states the tundish transfer car as imported contained additional features that regulate the flow of molten steel, "is not credible nor sufficient to support Mitsubishi's claims on this point" because "[t]he affidavit does not distinguish between the condition of the merchandise *after* it has been imported and installed from its condition at the time of entry." (Def.'s Reply at 16.) Defendant also argues the drawings of the ladle-to-tundish shroud changing mechanism make clear that the mechanism is properly classified as only a handling machine under 8428.90, HTSUS, "as the article appears and performs as a simple mechanical arm." (Def.'s Br. at 21.)

■■■ This Court finds Customs properly classified the tundish transfer car and shroud changing mechanism under subheading 8428.90, HTSUS, as "Other lifting, handling, loading or unloading machinery: . . . Other machinery:", dutiable at 2% *ad valorem*. This Court finds no evidence that the tundish transfer car or shroud changing mechanism perform the additional casting operations plaintiff claims without parts added after importation. In their condition as imported, this Court find these components were classified properly by Customs because they perform lifting and handling functions. Plaintiff's expert, Mr. Umeda, stated in his affidavit that the ladle-to-shroud changing mechanism "is used to detach, remove and replace the nozzle leading from the ladle into the tundish" and the tundish transfer car "locates and supports the tundish in the casting position" and "is equipped with a lifting mechanism." (Umeda Aff. ¶¶ 18, 16, 24.) His statements further support Customs' classification of these items as "lifting, handling, loading or unloading machinery" under subheading 8428.90, HTSUS.

(c) Tundish Lifting Beam, Segment Changer System, Segment Lifting Beam, Mold and First Zone Lifting Beam and Segment Transfer Car

The segment changer system is a stationary guide in the form of an overhead crane used to align the segments [12] for removal or insertion. (*See* Pl.'s Facts at 9; Def.'s Resp. at 9.)

The segment transfer car is used to transport a segment between the storage area and the area where the casting operation occurs. The segment transfer car is mounted permanently on the ground floor and moves be-

---

12. The containment section of the casting machine consists of an array of roller segments and drive roll units. The roller segments are arranged on a given path forming a vertical section of approximately twelve feet, bending into a curved section of approximately forty feet radius, and ending with a horizontal path of additional roller segments to straighten and withdraw the still-forming curved slab. The roller segments contain the forming slab at a desired width, as the top and bottom roller segments are precisely spaced to create a gap of predetermined distance through which the slab passes, and to control bulging and breakouts. In addition to containing the forming slab, the roller segments must be strong enough to withstand the bending reaction forces during the bending and straightening phases. (*See* Pl.'s Facts at 7–8; Def.'s Resp. at 6.)

tween the casting bay and the replacement bay, an area away from the casting operations where the segments are stored. (*See* Def.'s Resp. at 9; Pl.'s Facts at 10.)

The tundish lifting beam is a specially designed component used to remove the tundish from the tundish car, thus allowing for the replacement of the refractory bricks. (*See* Pl.'s Facts at 5; Def.'s Resp. at 4.) The tundish lifting beam removes the tundish by lifting and lowering the tundish and is located in an area away from the casting operation. The molten steel passes from the tundish into the mold, where heat is removed from the molten steel by cooling the mold walls with water, thus causing a thin shell to form around the molten steel. (*See* Pl.'s Facts at 6–7.)

The mold is a set of water-cooled copper plates that form a rectangular shape into which the molten steel is poured. The plates' water-cooling system removes heat from the molten steel in order to initiate solidification and slab formation. The mold and first zone lifting beam is a special lifting tool used to extract the mold and the first zone together as a set or individually if necessary. (*See* Pl.'s Facts at 6; Def.'s Resp. at 5.) The thin shell is withdrawn from the mold in a controlled manner by the starter or dummy bar and passes into the containment section of the casting machine, which consists of an array of roller segments and drive roll units. (*See* Pl.'s Facts at 6; Def.'s Resp. at 5.) The segment lifting beam is used to move the entire segment. (*See* Pl.'s Facts at 9; Def.'s Resp. at 9.)

Plaintiff argues the above items are integral to the process of manufacturing steel but not the process of moving it. Plaintiff maintains the components are involved specifically in "the removal, insertion or alignment of other components of the casting machine, and are not used to move or convey raw materials or manufactured goods." (Pl.'s Br. at 37.) Plaintiff concludes "[t]hey are not handling equipment as they provide functions more than or other than handling finished goods or raw materials." (*Id.*)

Defendant argues "[t]he lifting beams, changer system, and transfer car act simply to handle specific parts of the casting machine (e.g., the segments and the tundish)." (Def.'s Br. at 21 (footnote omitted).) Defendant concludes because "Heading 8428 is not restricted to handling of materials only, these articles are not precluded from classification under Heading 8428 because they lift and handle parts of the casting machine, rather than 'materials.'" (*Id.*) Defendant adds the fact that the beams "are denominated as 'lifting beams' further shows that these articles are lifting and handling machinery." (*Id.* at 22.)

■ This Court finds Customs properly classified the tundish lifting beam, segment changer system, segment lifting beam, mold and first zone lifting beam and segment transfer car under subheading 8428.90, HTSUS as "Other lifting, handling, loading or unloading machinery . . . Other machinery . . ." as these components are described by plaintiff as having functions including aligning, transporting and removing steel slabs by lifting and handling. In an affidavit offered by plaintiff, Mr. Umeda states "[t]he segment changer system is a stationary guide in the form of an overhead crane used to align the segments for removal or insertion" and "[t]he segment lifting beam is used to move the entire segment." (Umeda Aff. ¶ ¶ 64–65.) Mr. Umeda's affidavit further states "[t]he segment transfer car is used to remove a segment from the casting bay and to insert a new segment in its place." (*Id.* at ¶ 67.) With respect to the lifting beams, Mr. Umeda states, "[t]he mold and first zone lifting beam is a special lifting tool used to extract the mold and the first zone together as a set or individually if necessary," and "[t]he tundish lifting beam is . . . used to remove the tundish from the tundish car." (*Id.* at ¶ 40, ¶ 29.)

■ Although plaintiff argues the above items are integral to the process of manufacturing steel but not to the process of moving it, this Court finds defendant's argument that the lifting beams, changer system, and trans-

fer car act to move and manipulate specific parts of the casting machine is correct. This Court agrees Heading 8428, HTSUS, is not restricted to articles which only handle materials, and finds it covers articles that lift and handle components of casting machines as well.

B. *Subheading 8483.40.50, HTSUS: Torch Roller Table Reducer with Coupling, Torch Runout Table Reducer with Gear Coupling*

Customs classified the torch roller table reducer with coupling and torch runout table reducer with gear coupling under subheading 8483.40.50, HTSUS, as

> Transmission shafts (including camshafts and crankshafts) and cranks; bearing housings, housed bearings and plain shaft bearings; gears and gearing; ball screws; gear boxes and other speed changers, including torque converters; flywheels and pulleys, including pulley blocks; clutches and shaft coupling (including universal joints); parts thereof: ... Gears and gearing ...: Gear boxes and other speed changers: ... Other,

dutiable at 2.5% *ad valorem.*

The torch roller table with gear coupling is part of the torch roller table and is imported separately from the roller assembly of the torch roller table. Its function is to transfer power from a motor to the roller and allow for the changing of the speed at which the roller rotates. After importation, the torch roller table is mounted with the torch cutting machine, which is fixed onto a moving frame in order to exactly match the forward speed of the moving slab. The torch cutting machine will then sever the slab into a predetermined length. At this point in the process, the slab is still too soft and too hot to be removed by either tongs or a magnet and it proceeds onto the deburring table. (*See* Pl.'s Facts at 11–12; Def.'s Resp. at 11.)

The torch runout table with gear coupling is coupled to a motor and is used to rotate a roll assembly for the torch runout table. Its function is to transfer power from a motor to

the roller and allows for the changing of the speed at which the roller rotates. It is part of the torch runout table but is imported separately from the roller assembly of the torch runout table. (*See* Pl.'s Facts at 11; Def.'s Resp. at 11.)

Plaintiff argues these components used to rotate roll assemblies are gear reducers with couplings, and are not described as "gear boxes or speed changers." (Pl.'s Br. at 41.) Plaintiff concludes the reducers with couplings "are something other or more than what is usually classified as a gear box or speed reducer." (*Id.* at 42.)

Defendant argues Customs' classification is correct and cites plaintiff's description of the table reducers as " 'gear reducer[s] with coupling. [They are] coupled to a motor, and [are] used to rotate a roll assembly.' " (Def.'s Br. at 24 (quoting Pl.'s Resp. to Def.'s First Interrog. at 13).) Defendant contends a coupling is described in the *McGraw Hill Encyclopedia of Science and Technology* as " 'the mechanical fastening that connects shafts together for power transmission.' " (*Id.* at Ex. 6.) Defendant additionally maintains the Explanatory Notes to Heading 84.83 "describe gear boxes and speed changers as mechanical parts which are used in the transmission of power from an external power unit to machines, and internal parts of a machine used to transmit power to parts of the same machine." (*Id.* at 24.) Defendant concludes "[i]t is clear, therefore, that these components are used in the transmission of power from the motor to the rollers of the roller table. As such, it was properly classified under 8483.40.50, HTSUS, as gear boxes and other speed changers." (*Id.*)

 This Court finds Customs correctly classified the table reducers under subheading 8483.40.50, HTSUS, as

> Transmission shafts (including camshafts and crankshafts) and cranks; bearing housings, housed bearings and plain shaft bearings; gears and gearing; ball screws; gear boxes and other speed changers, including torque converters; flywheels and pulleys, including pulley blocks; clutches

and shaft coupling (including universal joints); parts thereof: ... Gears and gearing ...: Gear boxes and other speed changers: ... Other,

dutiable at 2.5% *ad valorem*. The Court agrees with defendant that these components are used in the transmission of power and are properly classified.

C. *Subheading 8431.39.00, HTSUS: Torch Roller Table Roller (with bearing housing), Torch Runout Table Roller (with bearing housing), Roll Assemblies for Torch Roller Table and Roll Assemblies for Torch Approach Table*

Customs classified the torch roller table roller (with bearing housing), torch runout table roller (with bearing housing), roll assemblies for torch approach table and roll assemblies for torch roller table under subheading 8431.39.00, HTSUS, as "Parts suitable for use solely or principally with the machinery of headings 8425 to 8430: ... Other", dutiable at 2% *ad valorem*.

The torch roller table roller with bearing housing is a roller with bearing housing. (*See* Pl.'s Facts at 11; Def.'s Resp. at 11.) The torch runout table roller with bearing housing is a roller with a bearing housing. (*Id.*) The roll assemblies for the torch approach table are used to support and move the cast slab between the exit of the withdrawal straightening unit and torch roller table. (*Id.*) The roll assemblies for the torch roller table are used to support and advance the cast slab while the torch cuts the slab. (*Id.*)

Plaintiff describes the components as "roll assemblies, some with bearing housing[13] attached," which are "imported as extra roll assemblies for use in the torch roller table, torch runout table or torch approach table should replacement of preexisting [assemblies] become necessary." (Pl.'s Br. at 42.) Plaintiff maintains Customs' reason for classifying this merchandise under subheading

8431.39.00, HTSUS, is because "Customs classified the torch roller table, torch runout table and the torch approach table under [Heading] 8428 as 'other conveyors'" and thus "conclude[d] that the extra roll assemblies are parts of goods (conveyors) classifiable under [Heading] 8428 rather than parts of continuous steel casting machines of heading 8454." (*Id.*) Plaintiff concludes

[i]f this Court rejects Defendant's classification of the torch roller table, torch runout. table and torch approach table under heading 8428.39, it must then reject Defendant's classification of the additional roll assemblies under 8431.39.00.... Because these are parts of a continuous steel casting machine, not parts of a conveyor, they must be classified under heading 8454.

(*Id.* at 42–43.)

Defendant argues because the components are parts of handling machines classified in Chapter 84, HTSUS, they are classified properly under subheading 8431.39, HTSUS, by operation of Note 2(a) to Section XVI. Defendant, citing plaintiff's definition of the roll assemblies for the torch approach table and the torch roller table as extra rollers for these tables, concludes

[t]hus, they are parts of the torch approach table and the torch roller table. Since, as shown previously, the roller tables are conveyors classifiable under Heading 8428, the roll assemblies, as parts of the conveyors, are classifiable under Heading 8431, and specifically, under 8431.39.00, HTSUS, as parts of machines of Heading 8428.

(Def.'s Br. at 25.)

 This Court finds as it has already determined Customs properly classified the torch roller table, torch approach table and torch runout table under subheading 8428.39.00, HTSUS, the torch roller table roller (with bearing housing), torch runout table roller (with bearing housing) and roll assemblies for the torch approach and torch

---

**13.** A housing is defined as "[a] case or enclosure to cover and protect a structure or a mechanical device." *McGraw–Hill Dictionary of Scientific and Technical Terms* 706 (1995). Defendant

adds "[t]hus, a 'bearing housing' is a case that covers and protects bearings." (Def.'s Br. at 25 n. 12.)

roller tables are classified properly under 8431.39.00, HTSUS, as parts of Heading 8428, HTSUS.

### D. *Subheading 8419.89.50, HTSUS: Tundish Nozzle Preheat Station*

Customs classified the tundish nozzle preheat station under subheading 8419.89.50, HTSUS, as

> Machinery, plant or laboratory equipment, whether or not electrically heated, for the treatment of materials by a process involving a change of temperature such as heating, cooking, roasting, distilling, rectifying, sterilizing, pasteurizing, steaming, drying, evaporating, vaporizing, condensing or cooling, other than machinery or plant of a kind used for domestic purposes; instantaneous or storage water heaters, nonelectric; parts thereof: Other machinery, plant or equipment: Other: Other,

dutiable at 4.2% *ad valorem*.

The tundish nozzle pre-heat station "is a gas heater located on the casting floor and is used to pre-heat the tundish nozzle. Preheating the tundish nozzle at the tundish nozzle pre-heat station prevents clogging in the tundish nozzle, and keeps the refractories in the tundish nozzle from cracking." ((Pl.'s Facts at 6.) *See also* Def.'s Resp. at 5).

Plaintiff describes the tundish nozzle preheat station as "a gas heater positioned on the casting floor, and ... used to preheat the tundish nozzle," which prevents clogging and keeps the refractories from breaking, aiding the continuous casting operation. (Pl.'s Br. at 44.) Plaintiff argues "[a]s with the other provisions chosen by Customs under which to classify this merchandise, subheading 8419.89.50 is an 'other: other: other' catch-all provision that does not specifically describe the imported merchandise." (*Id.* at 45.) Plaintiff argues the provision under which Customs chose to classify the tundish nozzle pre-heat station "suffers from the same lack of specificity as do the other provisions.... None of the exemplars listed in the heading or subheadings describes the tundish nozzle preheat station." (*Id.*) Plain-

tiff concludes the entry must be classified under Heading 8454, HTSUS, as a part of a casting machine.

Defendant argues as a gas heater, the tundish nozzle pre-heat station "falls squarely into the assessed provision of subheading 8419.89.50, HTSUS, which includes machinery for the treatment of material by a process involving change of temperature, such as heating." (Def.'s Br. at 26.) Defendant concludes "because the merchandise is clearly a 'good' included in chapter 84, it must, pursuant to the Section XVI notes, be classified under subheading 8419.89.50, HTSUS." (*Id.*)

 This Court finds the tundish nozzle preheat station was classified properly under subheading 8419.89.50, HTSUS, as

> Machinery, plant or laboratory equipment, whether or not electrically heated, for the treatment of materials by a process involving a change of temperature such as heating, cooking, roasting, distilling, rectifying, sterilizing, pasteurizing, steaming, drying, evaporating, vaporizing, condensing or cooling, other than machinery or plant of a kind used for domestic purposes; instantaneous or storage water heaters, nonelectric; parts thereof: Other machinery, plant or equipment: Other: Other,

dutiable at 4.2% *ad valorem*. Plaintiff's expert states the tundish nozzle preheat station "is a gas heater" and "is used to preheat the tundish nozzle." (Umeda Aff. ¶ 33.) These functions support Customs' classification of this component. The Court does not agree with plaintiff's argument the subheading proposed by Customs is a "catch-all" provision that does not specifically describe the merchandise, (*see* Pl.'s Br. at 45), and finds the subheading adequately describes the functions performed by the component.

### E. *Subheading 8536.50.00, HTSUS: Tundish Car Limit Switch Bracket*

Customs classified the tundish car limit switch bracket under subheading 8536.50.00, HTSUS, as "Electrical apparatus for switching or protecting electrical circuits ... (for

example, switches, relays, fuses, surge suppressors, plugs, sockets, lamp holders, junction boxes), for a voltage not exceeding 1,000 V: Other switches", dutiable at 5.3% *ad valorem.* The tundish car limit switch bracket is a non-electrical bracket that supports a limit switch which is added after entry. (*See* Pl.'s Facts at 5–6; Def.'s Resp. at 5.)

Plaintiff argues "[a]s with the other provisions described above, subheading 8536.50.00 does not describe the tundish car limit switch bracket. In turn, by operation of Note 2(b)[14] to Section XVI, this component must be classified under heading 8454." (Pl.'s Br. at 46.) Plaintiff maintains to be classified under Heading 8536, HTSUS, the merchandise must be "electrical apparatus", while

[t]he tundish car limit switch bracket, however, is simply a bracket that will support a limit switch added after entry. It is a non-electrical device. Therefore, the tundish car limit switch bracket does not fit within the threshold requirement of being an electrical apparatus for classification under heading 8536 and must be classified under 8454.

(*Id.* (citations omitted).)

Defendant explains initially Customs mistakenly classified the tundish car limit switch bracket under subheading 8536.50.00, HTSUS, rather than under subheading 8431.39, HTSUS[15] due to "a misunderstanding regarding the identity of the article." (Def.'s Br. at 26.) Defendant argues "[t]he function of a bracket is to provide support, and in this case, to support a limit switch which is attached or installed on the tundish transfer car," which is classifiable under Heading 8428, HTSUS. (*Id.*) Defendant concludes "[a]ccordingly, this merchandise is classifiable under 8431.39, HTSUS." (*Id.*) In response to plaintiff's argument, defendant maintains "Mitsubishi misunderstands that the tundish car limit switch bracket is de-

signed to be added to the tundish car after importation" and therefore, "it is a part of the tundish transfer car, not a part of the continuous casting machine." (Def.'s Reply at 17.)

■ This Court finds defendant's argument persuasive that the tundish limit switch bracket's function is to provide support for the limit switch which is attached to the tundish transfer car. Furthermore, because the tundish limit switch bracket is designed to be added to the tundish car after importation, the Court finds the bracket is part of the tundish transfer car and not a part of the continuous casting machine. The Court holds the tundish limit switch bracket is correctly classified under subheading 8431.39, HTSUS, as "Parts suitable for use solely or principally with the machinery of headings 8425 to 8430: ... Other", dutiable at 2% *ad valorem,* instead of under Heading 8454, HTSUS, as part of a continuous casting machine.

F. *Subheading 6903.90.00, HTSUS: Tundish Skull Punching*

Customs classified the tundish skull punching under subheading 6903.90.00, HTSUS, as "Other refractory ceramic goods ... other than those of siliceous fossil meals or of similar siliceous earths: Other:", dutiable at 4.9% *ad valorem.* The tundish skull is a refractory located at the opening of the tundish nozzle and it is removed for replacement at the same time the bricks in the tundish are changed. The tundish skull punching is used to remove the tundish skull from the tundish nozzle. (*See* Pl.'s Facts at 6; Def.'s Resp. at 5.)

Defendant explains Customs classified the tundish skull punching under subheading 6903.90.00, HTSUS, based on the misunderstanding that the article was the tundish skull itself. Defendant continues to explain

---

**14.** Note 2(b) provides "Other parts, if suitable for use solely or principally with a particular kind of machine, or with a number of machines of the same heading ... are to be classified with the machine of that kind ..."

**15.** 8431.39.00, HTSUS, provides for "Parts suitable for use solely or principally with the machinery of headings 8425 to 8430: ... Other", dutiable at 2% *ad valorem.*

[a]s the article is the mechanism used to handle the tundish skull, the article is properly classifiable under Heading 8479.89.60 at a duty rate of 4.2% *ad valorem*, unless Mitsubishi can demonstrate, which it has not, that the merchandise does not have a self-contained motor, in which case it is properly classified under 8479.89.90, HTSUS, with a duty rate of 3.7% *ad valorem;* or is hand held, in which circumstances it is properly classified under 8467.89.50, HTSUS, at a duty rate of 2.5% *ad valorem.*

(Def.'s Br. at 27 n. 14.)

Plaintiff explains the tundish skull punching is used to remove the tundish skull by punching it from the tundish nozzle and, unlike the tundish skull, the tundish skull punching is not a refractory ceramic good. Plaintiff argues "[a]s such, it cannot be classified under a provision for '[o]ther refractory ceramic goods.' " (Pl.'s Br. at 47.) Plaintiff further contends because "Section Note 2 states that a part of a machine, if used solely or principally with that kind of machine, is classified with that machine unless it is a 'good[ ] included in . . . . the headings of chapters 84 and 85 . . . .' ", even under defendant's interpretation of the "goods included in" language in Section Note 2, Heading 6903, HTSUS, is not a heading in chapter 84 or 85. Plaintiff concludes "[a]gain, by operation of law, the tundish skull punching, because it is suitable for use solely or principally with a casting machine, must be classified under heading 8454." (*Id.*)

Defendant argues the tundish skull punching "is classifiable under Heading 8479, as 'machines or mechanical appliances having individual functions, not specified or included elsewhere in this chapter.' " (Def.'s Br. at 27.) Defendant cites the Explanatory Notes to Heading 84.79, asserting they "provide examples of what the term 'individual functions' intends" and argues "the function of the tundish skull punching is distinct and independent of the 'casting' function of the continuous casting machinery because the sole purpose of the tundish skull punching is to remove the tundish skull." (*Id.* at 26, 27–28.) Defendant also maintains "the tundish skull punching is not mounted or attached to any of the casting machinery, but is located in the 'tundish yard.' "[16] (*Id.* at 29.) Defendant additionally contends even if plaintiff's arguments are correct that a relative specificity analysis is appropriate, the tundish skull punching should still be classified under Heading 8479, HTSUS, because the provision for parts of casting machines in Heading 8454, HTSUS, under which plaintiff claims classification, is not more specific than Heading 8479, HTSUS.

The Court finds, as plaintiff describes, the tundish skull punching functions to remove the tundish skull from the tundish nozzle and agrees with defendant this function is distinct and independent of the "casting" function of the continuous steel casting machinery. The Court also notes plaintiff's explanation the tundish skull punching removes the tundish skull by punching it from the tundish nozzle and, unlike the tundish skull, is not a refractory ceramic good, making Customs's original classification of this item under subheading 6903.90.00, HTSUS, as "Other refractory ceramic goods . . . other than those of siliceous fossil meals or of similar siliceous earths: Other:, dutiable at 4.9% *ad valorem* incorrect." This Court finds the tundish skull punching is classified properly by Customs under subheading 8479.89.60, HTSUS, as "Machines or mechanical appliances having individual functions, not specified or included elsewhere in this chapter; parts thereof: . . . Other: . . . Other:", dutiable at 4.2% *ad valorem.* The Court finds persuasive defendant's argument that the function of the tundish skull punching to remove the tundish skull is distinct and independent of the casting function of the continuous steel casting machine.

**16.** Defendant explains "[t]he tundish skull is located at the bottom of the tundish and above the tundish nozzle." (Def.'s Br. at 29 n. 15.) Defendant continues to explain "[t]he tundish skull punching mechanism is located in the tundish yard, which appears to be an area away from the casting line, where the tundishes and segments are repaired." (*Id.* (citing Exs. 1, 4 and 7).)

## G. *Subheading 9031.80.00, HTSUS: Segment Test Stand*

Customs originally classified the segment test stand under subheading 9031.80.00, HTSUS, as "Measuring or checking instruments, appliances and machines, not specified or included elsewhere in this chapter; profile projectors; parts and accessories thereof: Other instruments, appliances and machines", dutiable at 4.9% *ad valorem*. The segment test stand is a metal stand and is not a diagnostic device, instrument, appliance or machine. (*See* Pl.'s Facts at 10; Def.'s Resp. at 10.)

Plaintiff argues the subheading used by Customs "is not one of the ones found in either chapters 84 or 85, and thus by operation of law the segment test stand is classifiable under heading 8454." (Pl.'s Br. at 48.) Plaintiff additionally argues the specific language of subheading 9031.80.00, HTSUS, "requires the presence of 'measuring or checking instruments, appliances and machines ...'" and the segment test stand "is simply a metal stand used to position a segment so that the distance between the rollers can be measured." (*Id.* (citation omitted).)

Defendant explains Customs' classification of this component "was based upon the misunderstanding that the article, in its condition as imported, has checking and measuring capabilities." (Def.'s Br. at 32.) Defendant states "[f]rom the photograph produced by Mitsubishi, [the segment test stand] is only a structural element. Accordingly, the Government agrees that the test stand is classifiable under Heading 8454, HTSUS." (*Id.*) Plaintiff states it "concurs with this new classification." (Pl.'s Opp'n at 22.)

 Both plaintiff and defendant agree the segment test stand is classifiable under Heading 8454, HTSUS. The Court finds persuasive defendant's argument that based on the photograph produced by plaintiff, this article is only a structural element and does not have checking and measuring capabilities, and holds this article should be reclassified under Heading 8454, HTSUS, free of duty. *See Jarvis Clark Co. v. United States*, 2 Fed. Cir. (T) 70, 74–75, 733 F.2d 873, 878 ("[T]he statute leaves to the court the discretion whether it should remand for further proceedings or should reach the correct decision on its own.... [T]he court's duty is to find the *correct* result, by whatever procedure is best suited to the case at hand.") (footnote omitted), *petition for reh'g denied*, 2 Fed. Cir. (T) 97, 739 F.2d 628 (1984).

## H. *Subheading 8438.40.50, HTSUS: Drive Units*

Customs originally classified the No. 3—No. 7 segment drive (roll) units and No. 8—No. 13 segment drive (roll) units [17] under subheading 8483.40.50, HTSUS, as

> Transmission shafts (including camshafts and crankshafts) and cranks; bearing housings, housed bearings and plain shaft bearings; gears and gearing; ball screws; gear boxes and other speed changers, including torque converters; flywheels and pulleys, including pulley blocks; clutches and shaft couplings (including universal joints); parts thereof: ... Gears and gearing ...: Gear boxes and other speed changers: ... Other,

dutiable at 2.5% *ad valorem*.

Defendant explains Customs' classification was based on its misunderstanding the articles consisted of gears and states "a review of the packing list in Entry No. 558–0012868–2, identifies the following articles with the segment drive units: universal joint, motorbase etc., lohmann planetary gears, and cotter pin. These elements indicate that the merchandise is a motor, and classifiable under Heading 8501." (Def.'s Br. at 30 (footnote omitted).) Defendant argues the drive units are correctly classified under subheading 8501.32.20, HTSUS as "Electric motors and generators (excluding generating sets)

---

**17.** Plaintiff and defendant disagree over whether the term for these items are drive units or drive roll units. Defendant argues the merchandise is invoiced as "no. 3–no. 7 seg. Drive units" and "no. 8—no. 13 seg. Drive units" and not as "drive roll units". (*See* Def.'s Br. at 30.)

... Of an output exceeding 750 W but not exceeding 75 kW: Motors: Exceeding 750 W but not exceeding 14.92 kW", dutiable at 3.7% *ad valorem.*

Plaintiff describes the no. 3—no.7 segment drive roll units and the no. 8—no. 13 segment drive roll units as enabling the roller segment to pinch and drive the forming slab out through the containment section. Plaintiff explains the segment drive roll units exert pressure on the forming slab as it is being cast, thus providing containment but not deforming its shape. (*See* Pl.'s Facts at 8.) Plaintiff argues the segment drive roll units "are neither gear boxes nor speed changers" but "are integral to the process of containment of the solidifying slab by pinching the forming slab to specific dimensions with a designated pressure, by preventing breakouts via their braking function, and by propelling the forming slab through the containment process." (Pl.'s Br. at 40.)

In support of its position, plaintiff contends the Explanatory Notes describe gear boxes and other speed changers as "consisting of assemblies of gears, friction disc or friction cone couplings and couplings with chains or driving belts, and variable speed fluid couplings, including hydraulic torque converters." (*Id.*) Plaintiff argues

> [t]he imported segment drive units, however, consist of a gear box, a universal spindle, an electric motor and a brake, all of which are mounted on a support structure. The segment drive units, because of these unique and different subcomponents and features, are something other or more than what is usually classified as a gear box or speed reducer. The segment drive units are not transmission devices, and thus function in a manner inconsistent with gear boxes or speed changers, as well as the other transmission exemplars of heading 8483. As stated above, segment drive

units in conjunction with the drive rolls and segment main cylinders exert pressure on the forming slab by pinching and breaking it, giving it definition and shape, and preventing deforming or breakouts.

> Segment drive units are not described by the provision covering gear boxes and speed reducers, and thus cannot be classified under that provision. This conclusion is consistent with the holding of this court in the first *Mitsubishi* decision, which reviewed whether segment drive units were classifiable as gear boxes or speed changers.

(*Id.* at 41 (citations omitted).)

Defendant maintains plaintiff's argument that the drive units, containing a universal spindle and a brake, contribute to the slab forming action of the segments, does not prevent their classification under Heading 8501, HTSUS. Defendant contends

> [w]e agree that the drive units would be classifiable under Heading 8454 if the universal spindle and brake were also imported with the component. However, as noted above, the description in the packing list does not include these two elements. Therefore, as imported, the merchandise is correctly classified under Heading 8501.32.20, HTSUS, at a duty rate of 3.7% *ad valorem.*

(Def.'s Br. at 30–31.) [18] Defendant argues the only evidence plaintiff offered to show the drive units contained a universal spindle and a brake was the assertions made in the Umeda affidavit offered by plaintiff. Defendant asserts "this affidavit did not describe the articles at issue in the condition as imported" and "there is *no* evidence as to whether [the universal spindle and a brake] were actually imported along with the electric motor and gear box." (Def.'s Reply at 18.) [19]

---

18. Defendant explains "[b]ased on the evidence provided by Mitsubishi in discovery, it appears that the motor has an output of 7.42 kilowatts, or 10 horsepower, and is therefore classifiable under this subheading." (Def.'s Br. at 31 n. 17.)

19. In a footnote, defendant explains

> Inasmuch as the Government only recently determined at this late stage that the merchan-

dise is classifiable within Heading 8501, we have not filed a counterclaim alleging classification under subheading 8501.32.20, HTSUS. However, in the event this Court determines the correct subheading is 8501.32.20, the court may make that determination in its opinion and judgment, and dismiss the action, without ordering reliquidation under that subheading. In such situation, a determination of the correct classification would have been made, but

■ This Court finds plaintiff lacks sufficient evidence to demonstrate the universal spindle and a brake actually were imported along with the electric motor and gear box and, for this reason, finds defendant's proposed classification of the drive units under subheading 8501.32.20, HTSUS as "Electric motors and generators (excluding generating sets) . . . Of an output exceeding 750 W but not exceeding 75 kW: Motors: Exceeding 750 W but not exceeding 14.92 kW", dutiable at 3.7% *ad valorem* is correct. *See Jarvis Clark Co.*, 2 Fed. Cir. (T) at 74–75, 733 F.2d at 878 ("[T]he statute leaves to the court the discretion whether it should remand for further proceedings or should reach the correct decision on its own. . . . [T]he court's duty is to find the *correct* result, by whatever procedure is best suited to the case at hand.") (footnote omitted). The Court observes defendant acknowledges its proposal to reclassify the drive units under subheading 8501.32.20, HTSUS, is raised as an affirmative defense because defendant did not file a counterclaim alleging classification under this subheading. The Court further observes, as a result of its decision not to file a counterclaim, defendant has not requested Customs reliquidate the entries of drive units at issue or that plaintiff be required to pay any difference in duties.

## CONCLUSION

For all the reasons discussed above, this Court grants in part and denies in part plaintiff's Motion for Summary Judgment and grants in part and denies in part defendant's Cross–Motion for Summary Judgment. The Court holds Customs properly classified (1). the torch approach table, torch runout table, torch roller table and slab transfer table under subheading 8428.39.00, HTSUS, dutiable at 2% *ad valorem;* (2). the segment changer system, ladle turret, tundish trans-

fer car, ladle-to-tundish shroud changing mechanism, tundish lifting beam, segment lifting beam, mold and first zone lifting beam and the segment transfer car under subheading 8428.90, HTSUS, dutiable at 2% *ad valorem;* (3). the table reducers under subheading 8483.40.50, HTSUS, dutiable at 2.5% *ad valorem;* (4). the table rollers (with bearing housing) and roll assemblies under 8431.39.00, HTSUS, dutiable at 2% *ad valorem;* and (5). the tundish nozzle preheat station under subheading 8419.89.50, HTSUS, dutiable at 4.2% *ad valorem.*

This Court further holds defendant's proposed classifications of (1). the deburring table under subheading 8428.39.00, HTSUS, dutiable at 2% *ad valorem;* (2) the tundish car limit switch bracket under subheading 8431.39.00, HTSUS, dutiable at 2% *ad valorem;* and (3). the tundish skull punching under subheading 8479.89.60, HTSUS, dutiable at 4.2% *ad valorem* are correct. The Court will order Customs to reclassify these items under defendant's proposed tariff subheadings.

With respect to the drive units, the Court observes defendant acknowledges its proposal to reclassify them under subheading 8501.32.20, HTSUS is raised as an affirmative defense because defendant did not file a counterclaim alleging classification under this subheading. The Court further observes, as a result of its decision not to file a counterclaim, defendant has not requested Customs reliquidate the entries of drive units at issue or that plaintiff be required to pay any difference in duties. The Court finds defendant's proposed classification under subheading 8501.32.20, HTSUS, as "Electric motors and generators (excluding generating sets) . . . Of an output exceeding 750 W but not exceeding 75 kW: Motors: Exceeding 750 W but not exceeding 14.92 kW" is correct and orders Customs to reclassify the drive units

Mitsubishi would not be required to pay the difference in duties, as we have not raised a claim seeking affirmative relief. We are only raising the alternative classification at this stage of the proceeding as a defense to Mitsubishi's claimed classification.

Alternatively, the court has the discretion to remand the case to Customs for further review as to the correct classification.
(Def.'s Br. at 31 n. 17 (citation omitted).)

under subheading 8501.32.20, HTSUS. The Court notes plaintiff is not required to pay the difference in duties as a result of the reclassification because defendant did not raise this subheading in a counterclaim.

Both plaintiff and defendant agree the segment test stand is classifiable under Heading 8454, HTSUS. The Court finds persuasive defendant's argument that based on the photograph produced by plaintiff, this article is only a structural element and does not have checking and measuring capabilities and holds this article should be reclassified under Heading 8454, HTSUS. As a result, this Court orders Customs to reclassify the segment test stand as part of a continuous steel casting machine under Heading 8454.90.00, HTSUS, free of duty, and refund all excess duties as provided for by law.

## JUDGMENT ORDER

This case having been submitted for decision and this Court, after due deliberation, having rendered a decision herein; now in conformity with said decision, it is hereby

**ORDERED** that plaintiff's Motion for Summary Judgment is granted in part and denied in part; and it is further

**ORDERED** that defendant's Cross–Motion for Summary Judgment is granted in part and denied in part; and it is further

**ORDERED** that Customs properly classified (1). the torch approach table, torch runout table, torch roller table and slab transfer table under subheading 8428.39.00, HTSUS, dutiable at 2% *ad valorem;* (2). the segment changer system, ladle turret, tundish transfer car, ladle-to-tundish shroud changing mechanism, tundish lifting beam, segment lifting beam, mold and first zone lifting beam and the segment transfer car under subheading 8428.90, HTSUS, dutiable at 2% *ad valorem;* (3). the table reducers under subheading 8483.40.50, HTSUS, dutiable at 2.5% *ad valorem;* (4). the table rollers (with bearing housing) and roll assemblies under 8431.39.00, HTSUS, dutiable at 2% *ad valorem;* and (5). the tundish nozzle preheat station under subheading 8419.89.50, HTSUS, dutiable at 4.2% *ad valorem;* and it is further

**ORDERED** that defendant's proposed classifications of (1). the deburring table under subheading 8428.39.00, HTSUS, dutiable at 2% *ad valorem;* (2). the tundish car limit switch bracket under subheading 8431.39.00, HTSUS, dutiable at 2% *ad valorem;* and (3). the tundish skull punching under subheading 8479.89.60, HTSUS, dutiable at 4.2% *ad valorem* are correct and Customs will reclassify the above-mentioned items; and it is further

**ORDERED** that defendant's proposed classification of the drive units under subheading 8501.32.20, HTSUS, as "Electric motors and generators (excluding generating sets) ... Of an output exceeding 750 W but not exceeding 75 kW: Motors: Exceeding 750 W but not exceeding 14.92 kW" is correct and Customs shall reclassify the drive units under subheading 8501.32.20, HTSUS. The Court notes plaintiff is not required to pay the difference in duties as a result of the reclassification because defendant did not raise this subheading in a counterclaim, and it is further

**ORDERED** that Customs shall reclassify the segment test stand under heading 8454.90.00, HTSUS, free of duty, and refund all excess duties as provided for by law.

## APPENDIX

### CERTAIN RELEVANT TARIFF PROVISIONS

(1). Note 2 to Section XVI of the HTSUS provides in relevant part as follows:

Subject to note 1 to this section, note 1 to chapter 84 and to note 1 to chapter 85, parts of machines ... are to be classified according to the following rules:

(a) Parts which are goods included in any of the headings of chapters 84 and 85 ... are in all cases to be classified in their respective headings;

(b) Other parts, if suitable for use solely or principally with a particular kind of machine, or with a number of machines of

the same heading . . . are to be classified with the machine of that kind. . . .

(2). Rule 1(c) of the Additional U.S. Rules of Interpretation of the HTSUS provides

In the absence of special language or context which otherwise requires—

(c) a provision for parts of an article covers products solely or principally used as a part of such articles but a provision for "parts" or "parts and accessories" shall not prevail over a specific provision for such part or accessory;

. . .

(3). Rule 10(ij) of the General Interpretive Rules ("GIRs") of the Tariff Schedules of the United States ("TSUS") provides that for the purposes of the TSUS

a provision for "parts" of an article covers a product solely or chiefly used as a part of such article, but does not prevail over a specific provision for such part.

(4). Heading 8428, HTSUS provides for "Other lifting, handling, loading or unloading machinery (for example, elevators, escalators, conveyors, teleferics)."

(5). Subheading 8428.39.00, HTSUS provides for "Other lifting, handling, loading or unloading machinery: . . . Other continuous-action elevators and conveyors, for goods or materials: Other", at a duty rate of 2% *ad valorem.*

(6). Subheading 8460.90, HTSUS provides for "Machine tools for deburring, sharpening, grinding, honing, lapping, polishing or otherwise finishing metal, sintered metal carbides or cermets by means of grinding stones, abrasives or polishing products, other than gear cutting, gear grinding or gear finishing machines of heading 8461: Other:", at a duty rate of 4.4% *ad valorem.*

(7). Subheading 8428.90, HTSUS provides for "Other lifting, handling, loading or unloading machinery: . . . Other machinery:", at a duty rate of 2% *ad valorem.*

(8). Subheading 8483.40.50, HTSUS provides for

Transmission shafts (including camshafts and crankshafts) and cranks; bearing housings, housed bearings and plain shaft bearings; gears and gearing; ball screws; gear boxes and other speed changers, including torque converters; flywheels and pulleys, including pulley blocks; clutches and shaft coupling (including universal joints); parts thereof: . . . Gears and gearing . . .: Gear boxes and other speed changers: . . . Other,

at a duty rate of 2.5% *ad valorem.*

(9). Subheading 8431.39.00, HTSUS provides for "Parts suitable for use solely or principally with the machinery of headings 8425 to 8430: Of machinery of heading 8428: Other", at a duty rate of 2% *ad valorem.*

(10). Subheading 8419.89.50, HTSUS provides for

Machinery, plant or laboratory equipment, whether or not electronically heated, for the treatment of materials by a process involving a change of temperature such as heating, cooking, roasting, distilling, rectifying, sterilizing, pasteurizing, steaming, drying, evaporating, vaporizing, condensing or cooling, other than machinery or plant of a kind used for domestic purposes; instantaneous or storage water heaters, nonelectric; parts thereof: Other machinery, plant or equipment: Other: Other:,

at a duty rate of 4.2% *ad valorem.*

(11). Subheading 8536.50.00, HTSUS provides for "Electrical apparatus for switching or protecting electrical circuits, . . . (for example, switches, relays, fuses, surge suppressors, plugs, sockets, lamp-holders, junction boxes), for a voltage not exceeding 1,000 V: Other:", at a duty rate of 5.3% *ad valorem.*

(12). Subheading 6903.90.00, HTSUS provides for "Other refractory ceramic goods . . . other than those of siliceous fossil meals or of similar siliceous earths: Other:", at a duty rate of 4.9% *ad valorem.*

(13). Subheading 8479.89.60, HTSUS, as "Machines or mechanical appliances having individual functions, not specified or included elsewhere in this chapter; parts thereof: . . . Other: . . . Other:", at a duty rate of at 4.2% *ad valorem*

(14). Subheading 8501.32.20, HTSUS provides for "Electric motors and generators (excluding generating sets): . . . Of an output exceeding 750 W but not exceeding 75 kW: Motors: Exceeding 750 W but not exceeding 14.92 kW" at a duty rate of 3.7% *ad valorem.*